DANIEL J. DAVIS AND THOMAS RANKIN v. ALBERT M.
BELFORD ET AL.

*Stock subscription—Liability of signers.*

The contract in this case (see opinion) is held to be *several*, and *each*
subscriber liable for the amount of his subscription. No other
question is involved.

Error to Oakland. (Moore J.) Argued April 19, 1888.
Decided April 27, 1888.

*Assumpsit.* Plaintiffs bring error. Affirmed. The facts
are stated in the opinion.

*Cass E. Herrington* and *Theo. Hollister,* for appellants.

*Taft & Smith* (*Thomas L. Patterson,* of counsel), for
defendants.

LONG, J. This is an action of *assumpsit,* brought in the
circuit court for the county of Oakland, against the defend-
ants, 42 in number, charging them jointly upon a contract,
the essential parts of which are as follows:

"CONTRACT AND SPECIFICATIONS FOR THE CHICAGO CREAM-
"ERY ASSOCIATION.
"Davis & Rankin, Proprietors.
"CHICAGO, ILL., November 20, 1885.

"We, Davis & Rankin, party of the first part, agree with
the parties of the second part to erect and put in operation a
creamery at or near Holly, Oakland county, Michigan, includ-
ing an ice-house, engine and coal room.

"The building to be 28x50 feet, 12 feet high, with three
air-chambers around the entire building, built of good sub-
stantial building material, and painted with two coats of
paint on the outside. All work to be done in a substantial

.and workman-like manner. * * * The plans and specifications of said creamery are hereunto attached, and made a part hereof.

" Said Davis & Rankin agree to erect said creamery, according to the within plans and specifications, for the sum of $4,500, payable as follows: $2,250 cash; $2,250 May 16, 1886.

" The subscribers hereto agree to pay the above amount for said creamery when completed; the subscribers agreeing to accept the same as soon as completed to within plans and specifications. Said creamery to be completed within 60 days after the above amount is subscribed; all payments under this contract to be made to Davis & Rankin, or their authorized agent.

" As soon as the above amount of $4,500 is subscribed, or in reasonable time thereafter, said subscribers shall incorporate under the laws of the State, as therein provided, fixing the aggregate amount of stock at $4,500, to be divided into 45 shares of $100 each; also it shall be further provided in the articles of said corporation, and in the by-laws thereof, that no assessment shall be made on the stockholders of said company for the indebtedness of the same; neither shall the private property of said stockholders be liable for such indebtedness (except that which is hereby created, and to be paid to the party of the first part.)

"That after said organization is completed, said company shall issue stock to the above-mentioned subscribers, to the amount of their subscription hereunto annexed.

"For a faithful and full performance of our respective parts of the above contract, we bind ourselves, our heirs, executors, administrators, and assigns.

"Executed and dated December 16, 1885.

"DAVIS & RANKIN, Chicago."

This contract was subscribed by the names of all the defendants, and opposite their names appeared the amount of each individual subscription, varying in amount from $25 to $800 each.

"Davis & Rankin agree to allow parties of the second part $100 for the land to build said creamery on."

On the back of this contract is written the following:

"HOLLY, MICH., February 16, 1886.
"We, the undersigned, building committee and directors

of Holly Creamery Co., do and agree this day to accept of building, etc. (with the exceptions attached hereon), believing it to be fully according to contract.

"A. M. BELFORD,
"LOTT SMITH,
"C. J. ALLEN,
"SUMNER C. AUSTIN,
"M. S. DOWNING,
"Directors' Committee.

"With the exceptions of water supply, pointing, foundation, and painting. Parties of the first part agree to furnish a good supply of water, and to have painting done as per contract. This contract to be delivered up when these exceptions are accepted by the board of directors.

"DAVIS & RANKIN.

"HOLLY, February 25, 1886.

"We, the undersigned, agree to accept of the above as completed according to contract. LOTT SMITH.
"A. M. BELFORD.
"SUMNER C. AUSTIN.
"J. A. DIVINE."

The declaration is upon the common counts in *assumpsit*, to which the defendants pleaded the general issue.

The sole contention in this case is as to whether this is a joint or several contract.

The cause was tried before a jury, who, under the direction of the court, returned a verdict in favor of defendants, and the plaintiffs bring error.

The plaintiffs, to maintain their suit, proved their partnership, introduced in evidence the above contract, and written acceptance of the creamery building, and then proved a balance of $500, and interest, due and unpaid, and rested their case.

Defendants' counsel claimed that the contract upon which plaintiffs' action was founded is ambiguous, and the circuit judge, subject to plaintiffs' objection and exception, admitted in evidence certain contemporaneous oral statements as to the liability of the persons signing the contract, and certain letters, drafts, and receipts, as explanatory of the contract.

At the close of the trial, however, the court took the whole case from the jury.

It appeared upon the trial that the plaintiffs were doing business in the city of Chicago, and that S. J. Davis was their duly-authorized agent to organize creamery companies in different parts of the United States, making contracts for the erection of buildings for such purposes, and during the summer of 1885 came to Holly, Oakland county, for that purpose, and while there took into his employ Albert M. Belford, one of the defendants in this case, to assist him in organizing said company. The contract above set forth was drawn, and Mr. Belford accompanied Mr. Davis to the different parties to obtain their signatures thereto, and, in the talk with some of the subscribers, represented that they would only be holden for the amount subscribed opposite their names on the contract. Mr. Belford, assisted by S. J. Davis, obtained the signatures to the contract, with the understanding that each party only became liable for the amount of his individual subscription.

Mr. Belford subscribed for $800 of the stock, and his father for $200.

All the subscriptions have been paid except that of Belford and his father, and Belford had paid $500 on his and his father's subscription in labor, and for which he held the receipt of the plaintiffs.

After the signatures to the contract had been obtained, Mr. Belford held it, claiming that S. J. Davis had made some arrangement with him for commissions.

On October 29, 1885, plaintiffs wrote Mr. Belford:

"In reply to yours of October 27, will say that we would advise you to engage Mr. Embich, at two or three dollars per day, or even five dollars per day, for four or five days, to assist you in closing that contract, and anything that Mr. Embich will do in a business way that is legitimate will be satisfactory to us; and we would be pleased to build, and allow you the same commission that S. J. Davis promised.

you, as S. J. Davis is our agent, and whatever he agrees to do we will back up."

On January 11, 1886, plaintiffs again wrote Belford, declining to pay the $500 claimed by him as commissions, but offering to pay $400 for the $4,500 contract. In this letter the plaintiffs say:

"Now, we will pay you $400 in cash for a forty-five hundred dollar contract, with all good stockholders that are responsible, and that can be collected."

On January 20, 1886, plaintiffs again wrote Belford, in which they say:

"Now, if you consider this contract, and all the subscribers responsible that can be collected, you can send it to us; and, if we find it as you represent it to be, you can have your money."

This contract was afterwards delivered to the plaintiffs, and is the one upon which suit is brought.

Certain receipts were offered and received in evidence, given by plaintiffs' agent, A. J. Whittaker, to the different subscribers to this stock, which read, "For balance due on creamery stock." Plaintiffs gave some testimony tending to show that Whittaker held no authority to give such receipts.

There is no controversy in the case but that plaintiffs put up the building according to the terms of the contract, and that all the subscribers paid the amount of their subscription except defendant Belford and his father, and that the whole amount was paid except the sum of $500.

Some evidence was given on the trial tending to show that the plaintiffs, at their home office in Chicago, kept the account upon their books against the Holly Creamery Company, and not against each individual subscriber.

At the close of the trial, plaintiffs' counsel requested the court to charge the jury:

"1. The contract relied on in this case by plaintiffs is a joint contract, and the defendants were jointly liable for the amount mentioned therein at the time the building was accepted by the defendants.

"2. The form of the receipts given by Whittaker does not lessen the liability of the defendants, and the debt to plaintiffs was only canceled to the extent of the payments made.

"3. Plaintiffs are entitled to a verdict for $500, and interest from February 26, 1886.

"4. If the jury find that, previous to the witness Belford going to Burton to help form a creamery company, he had been notified by plaintiffs that if he did any more business with S. J. Davis he must look to him, then the work which Belford did at Burton cannot operate as a payment in this case.

"5. Even if the jury should find that the persons who induced the defendants to sign the contract in question stated to any of the defendants that they were not jointly liable, that cannot in any way be considered in determining the liability of the defendants in this case.

"6. The letter of October 29, 1885, cannot be considered in determining whether the contract in question was joint or several.

"7. The question of fraud in obtaining the signatures to the contract in question cannot be considered in this case, because no notice of fraud was given under the general issue."

The court declined to give these several requests in charge to the jury, but, among other matters, charged as follows:

"It seems to me, after carefully considering this entire contract, with the aid we have received by way of letters, instructions, or evidence of parties, that our interpretation of the contract is the correct one; * * * that this is a several contract; and that each of these subscribers is not liable for the $4,500. I believe that to be the interpretation of the contract; that they not only subscribed the sums set opposite their respective names, but thereby intended to limit their liability to those sums."

The court thereupon directed a verdict for the defendants.

We think the court was correct in his construction of the contract, and properly directed the verdict.

The law for the construction of contracts is well settled in *Dwelley v. Dwelley*, 143 Mass. 513 (10 N. E. Rep. 468):

" In the construction of contracts, the court will look at all the circumstances of the case, the nature of the property, the residence, occupations, and relations of the parties, the usages of the place, and of the business to which the contract relates, and ascertain, by reasonable inference, what the parties must have understood and mutually expected at the time of the making of the contract, and then adopt that construction which will best and most nearly carry the contract into effect as they intended and understood it."

Applying this rule to this contract, there is no difficulty in reaching the conclusion arrived at by the learned circuit judge who heard the case.

The defendants were 42 in number, and presumably following different occupations, trades, and business, scattered over a considerable extent of territory at and near Holly, in Oakland county. Plaintiffs' agent, having in charge the printed form of the contract, and acting under the direction of plaintiffs, and with a promise of payment of some considerable sums of money if he succeeded in organizing a creamery company there, obtained the signatures of defendants thereto; some of the defendants subscribing $25 and others amounts of $50, $100, $200, and one the sum of $800. The amount to be raised was $4,500. Is it to be presumed from the reading of the contract that, when one placed his name there for $25, he at once became liable to plaintiffs for the whole $4,500, the balance of which had not yet been subscribed, and the persons who were to make up the balance wholly unknown to the first subscriber? Or is it to be presumed from the reading of the contract that the first subscriber became liable for the amount subscribed by each additional one, whoever that subscriber might be, and for whatever amount he might subscribe, the first subscriber having no knowledge or information of the standing or responsibility of those subscribing after him?

We cannot believe the defendants could have so understood the language employed in the contract; and from the circumstances surrounding the case, and the conduct of the plaintiffs and their agents both before and after its execution, it would seem that they did not so construe it, but, on the contrary, acted upon the theory that each subscriber was only personally liable for his individual subscription; and this is the construction we must give it.

We find no error in the case, and the judgment must be affirmed, with costs.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred. CAMPBELL, J., did not sit.