## CHICAGO BLDG. & MANUF'G CO. v. GRAHAM et al.

### (Circuit Court of Appeals, Fifth Circuit. December 15, 1896.)

### No. 517.

SUBSCRIPTION CONTRACTS—JOINT AND SEVERAL LIABILITY.

The C. Co., which was engaged in the business of furnishing material and machinery for erecting plants for the manufacture of butter and cheese in localities suitable for such industry, entered into a contract with sundry persons for the erection of a butter and cheese factory at M., to cost $5,250. The contract provided that the factory should be erected and equipped in accordance with the specifications "indorsed hereon," and also provided that, as soon as the contract price was subscribed, the subscribers should form a corporation, with a capital not less than the amount subscribed, in shares of $100 each, to be issued to the subscribers in proportion to their paid-up interest; each subscriber to be liable to the corporation only for the amount subscribed by him. The form of the contract indicated that it was presented by the agent of the C. Co. to various persons, with a request for subscriptions to the erection of the factory, and it was signed by 42 individuals, who set opposite their names the number of shares taken, and the amount of stock after incorporation, in sums ranging from $25 for a quarter share to $500 for five shares. Indorsed on the contract were specifications for the factory, ending with a long sentence, which included the words, "there shall be no waiver of original and joint liability until the contract price is fully paid." *Held*, that there was no meeting of the minds of the parties on a proposition for a joint liability to the C. Co., and the contract of the subscribers was several only.

In Error to the Circuit Court of the United States for the Northern District of Mississippi.

W. A. McDonald, for plaintiff in error.
Thomas Spight, for defendants in error.

Before PARDEE and McCORMICK, Circuit Judges, and MAXEY, District Judge.

McCORMICK, Circuit Judge. The Chicago Building & Manufacturing Company, an Illinois corporation, brought its action against W. C. Graham, E. H. Baker, J. L. Grace, J. J. Scott, and I. N. Dodds, citizens of Union county, Miss., on the following contract and agreement, namely:

"The Chicago Building & Manufacturing Company, of Chicago, Illinois, party of the first part, hereby agrees with the undersigned subscribers hereto, party of the second part, to build, erect, complete, and equip, for said party of the second part, a combined butter and cheese factory, at or near Myrtle, Miss., as follows, to wit:

"The factory building shall be twenty-eight feet wide and forty-eight feet long, by twelve feet high, with an addition attached, twelve feet by twenty-four feet, for office and boiler and engine room, and an ice room, 12x16. Said building shall rest upon foundations described in specifications hereon. Said factory building is to be one story high, and divided into rooms as stated above, viz. a manufacturing room, also a water-cooler refrigerator, complete with galvanized pan, with sprinkler and force-pump connection, cheese-curing room, office, boiler, and engine room. Said factory shall be equipped with the following outfit, to wit: One eight horse power Howz engine, with twelve horse power Howz boiler, with inspirator and smoke stack; heating coil for office and cheese-curing room;

also, cold air register connection from refrigerator to cheese room, to more perfectly control the temperature; one centrifugal separator, 2,000 to 3,000 pounds capacity in one hour; one improved twin 400-gallon Fairlamb cream vat, lined with galvanized iron, and relined with Welsh charcoal tin; one 600-gallon milk-heating vat; one combination heating, tempering, and cooking cheese vat, of 500 gallons capacity; one revolving box churn, of 300 gallons capacity; one covered crank suction and force pump; one 300-pounds tempering tank for separator; one Fairlamb improved gearing power butter worker, center drip; one power combination revolving curd work salting and grinding machine; one improved single-gang cheese press; fourteen galvanized iron cheese hoops; one 600-pound milk-receiving can; one 400-pound milk scales; one 600-pound five-beam platform scales; one steam washing and cleaning tank; one large water tank for supplying boiler, milk vats, churns, etc., racks and shelves in curing room for curing cheese; water and steam pipes connecting with boiler; also, one lactometer; one siphon and strainer; one gang perpendicular curd knives; one gang horizontal curd knives; six milk-testing graduates; one druggist's graduate; one milk conductor; one side pail; one dairy thermometer; one strainer dipper; one butter trier; one cheese trier; one salt sieve; one belt punch; 25 feet rubber hose to carry water to vats, churn, and tanks; office desk and chair; one 60-patron milk book; also, belting, shafting, shaft collars, adjustable shaft hangers, pulleys, piping, pipe hangers, valves, gates, cocks, couplings, ells, tees, crosses, unions, nipples, plugs, and reducers necessary for the operation of said factory; also, one mop head; one combined wrench; two brushes; one broom; two butter ladles; one dipper; one coal scoop; one Babcock milk tester. Said building shall be constructed and equipped in substantial accordance with the specifications indorsed hereon, in a workmanlike manner. The engine and boiler, and all other machinery and fixtures, shall be set up, and shall be in running order, before the party of the second part shall be required to pay for said factory. The second party agrees to select, describe, and furnish, at its own expense, within ten days from the date of this contract, suitable and reasonable level land, with good title, and water ready to connect pump to for the use of the said factory, and agrees, within the same time, to appoint an executive committee, with full authority to represent second party's interests while first party is discharging said contract; and it is further understood that, in case the said second party shall fail to furnish said land and water within ten days after the execution of this contract, the Chicago Building & Manufacturing Company, at its option, may select and furnish land and water in behalf and at the expense of the subscribers. The Chicago Building & Manufacturing Company further agrees to provide and keep hired, at the expense of the stockholders, an experienced butter and cheese maker, for one year, if desired. The Chicago Building & Manufacturing Company agrees to erect said butter and cheese factory, as set forth by the above specifications, for fifty-two hundred & fifty dollars, payable in cash when factory is completed. We, the subscribers hereto, agree to pay the above amount for said butter and cheese factory, when completed. Said building to be completed within ninety days, or thereabout, after the above amount ($5,250.00) is subscribed. Any portion of the amount subscribed, not paid according to contract, shall bear legal rate of interest. As soon as the above amount ($5,250.00) is subscribed, or in a reasonable time thereafter, the said subscribers agree to incorporate under the laws of the state, as therein provided, fixing the aggregate amount of stock at not less than the amount subscribed, to be divided into shares of $100 each. Said share or shares, as above stated, to be issued to the subscribers hereto in proportion to their paid-up interest herein; and it is herein agreed that each stockholder shall be liable to the corporation only for the amount subscribed by him, and no more. Subscriptions may be obtained to this agreement to any amount in excess of $5,250.00, the price of factory proper, as above, and all subscriptions shall belong to first party until the full contract price has been fully collected therefor. The remainder of the subscription after the first party has been fully paid is the property of the second party, and may then be, by second party, also collected, and used as working capital. It is hereby understood that the Chicago Building & Manufacturing Company will not be responsible for any pledges, promises, or interpretations made by its agents or representatives that do not appear in this contract, and made a part thereof, either in print or writing. For the faithful

and full performance of our respective parts of the above contracts, we bind ourselves, our heirs, executors, administrators, and assigns.

"Executed and dated this 24th day of Dec., 1894.

"The Chicago Bldg. & Mfg. Co., the First Party,

"Per Dixon C. Williams, V. P., Special Agent.

| Names of Subscribers. | No. of Shares. | Amount of Stock after Incorporation. |
|---|---|---|
| W. R. Higginbotham & Son | 5 | 500 |
| J. A. Hill | 2 | 200 |
| J. J. Scott | 1 | 100 |
| W. H. Harwell | 2 | 200 |
| I. N. Dodds | 2 | 200 |
| R. L. Moore | 1 | 100 |
| J. D. Purnell | 2 | 200 |
| J. S. Morris | 2 | 200 |
| W. N. Hargrove | 1 | 100 |
| G. H. Murray | 2 | 200 |
| P. H. Stewart | 1 | 100 |
| W. C. Graham | 2 | 200 |
| T. H. Baker | 1 | 100 |
| N. A. McCallum | 1 | 100 |
| H. P. & G. W. Cathcort | 1 | 100 |
| J. S. Goode, M. D. | 1 | 100 |
| W. C. Anderson | 1 | 100 |
| W. M. Spencer | 1 | 100 |
| J. D. Kerr | 1 | 100 |
| F. M. Spencer | 1 | 100 |
| J. J. Robertson | 1 | 100 |
| W. M. Watson | 1 | 100 |
| J. A. Rowland | 1 | 100 |
| A. J. Russell | 1 | 100 |
| O. H. Purnell | 2 | 200 |
| Jno. L. Grace | 1 | 100 |
| W. M. Whitington, pr. Murray | 1 | 100 |
| J. D. Moore | 1 | 100 |
| A. J. Jones | 1 | 100 |
| L. V. Fowler | 1 | 100 |
| A. W. Hale | 1 | 100 |
| W. L. Dodds | 1 | 100 |
| S. C. Frazier | 1 | 100 |
| W. D. Barnett | 1 | 100 |
| J. W. Barnett | 1 | 100 |
| W. H. Milam | 1 | 100 |
| J. E. Liddell | 1 | 100 |
| M. S. Smith | ¼ | 25 |
| Joe M. Harrison | ½ | 50 |
| J. W. Hale | 1 | 100 |
| T. F. Dorman | 1 | 100 |
| P. H. Steward | 1 | 100 |
| J. C. Dousby | 1 | 100 |
| W. O. Butler | 1 | 100 |
| W. B. Banks | 1 | 100 |
| J. W. Norris | 1 | 100 |
| A. J. Halloway | ¼ | 25 |

"Specifications.

"Foundation Walls. The foundation walls for within building to be built of stone 16 to 18 inches thick, or of brick 12 inches thick. All walls to be of sufficient height to form a grade from the building, built of good lime and sand mortar, and placed from 16 to 18 inches below the surface of the ground.

"Sills. The sills to be made of 2x8 plank, spiked together.

"Joist. Joists are to be 2x10 inches, and 16 feet long, placed 16 inches from center to center, resting on the center girder. Ceiling joist to be well bridged.

"Studding. Studding to be 2x4. The outside studding placed a proper distance apart, so that the paper covers two spaces, or about 16 inches. Partitions as per ground plan.

"Rafters. Rafters for said buildings are 2x6 inches, and placed 2 feet from center to center, with 1x6 braces, in truss form, to support the roof. Collar beams suspended from rafters, in truss form, with 1x6 braces.

"Roof and Ventilators. The entire roofs to be covered with good quality of Extra Star A Star pine shingles, laid on 6-inch sheathing. The building to be supplied with ventilators in two gable ends.

"Flooring and Ceiling. Flooring and ceilings are to be of the grade known as 'First and Second Yellow Pine,' or 'C Norway Yellow or White Pine.' Flooring, 4 to 6 inches wide. Ceiling for office and manufacturing room, 4 to 6 inches, beaded. Engine room, cheese-curing room, and refrigerator, the same as manufacturing room.

"Air Chambers. Air chambers are to be constructed as follows: The inside of studding is lined with building paper, put up and down, and nailed to studs; then nail over paper a strip ⅞x2 inches; and, with ceiling inside and siding outside, it makes the air chambers necessary to the more perfect control of the temperature.

"Siding. Outside covered with ⅞ drop siding, of quality C Norway yellow or white pine.

"Cornice. The entire building to be corniced with plain cornice, projecting about 10 inches from body of building, as per plan.

"Windows. All windows to be double-glazed sash, improved frames, beveled refrigerator style. Size of glass, 12x26; 4 lights in sash, arranged stationary in frame.

"Doors. All doors are to be of the sizes and styles shown on drawings. All outside and refrigerator doors are to be beveled refrigerator style, from 3 to 4 inches thick, so as to more perfectly control the temperature. Inside doors 2 feet 8 inches by 6 feet 8 inches, 4 panels.

"Hardware. The building to be supplied with customary hardware, such as rim locks, bolts, hinges, and other fastenings needed for all doors and windows.

"Painting. Building to be painted with two coats of paint on the outside, except the roofs.

"Cold Storage. The cold storage to be the water-cooler refrigerator.

"Drains. Floors in, manufacturing room to slope to drains, as on plans.

"All materials connected with the building to be good, merchantable building material, as per grades above, and put together according to the plans and specifications, in a good, substantial, and workmanlike manner, and whether occupied by second party, or its incorporation, or its successors, there shall be no waiver of original and joint liability until the contract price is fully paid."

Connected with the foregoing is this exhibit to the declaration:

"It is agreed between the parties to the adjoining contract that, as soon as the full amount of this contract is subscribed, that the party of the second part, upon notification by first party, will come together in a body, and select from their number one man as a committee, who is to be immediately taken, by and at the expense of first party, into the Elgin district of Illinois, where factories have been long established, and examine the books of the same, talk to the patrons and stockholders, and if said committee does not find, from said investigation, that factories such as the adjoined contract contemplates do pay, when well managed, from 10% to 20% per annum on the costs of the plants, and that the cows do pay, when milked, and milk taken to the factories, from $40.00 to $70.00 each per year, this contract shall become null and void, and be surrendered to said committee to be destroyed; but, as soon as evidence of the truth of the above statement is found and reported by said committee, then the aforesaid adjoined contract shall be considered binding and in full force as to second party. It is further agreed that, upon completion of said factory, butter and cheese shall be made before payment of purchase price is exacted; second party agreeing to furnish milk for the test when first party shall call for the same, for which milk first party shall pay at the then market price. I have found the within representation fully sustained by my investigations.

"Dec. 24, '94.                                   Committee, W. H. Harwell."

It is evidently a part of the contract.

The defendants demurred to the declaration on the following grounds:

"(1) Because the alleged contract sued upon shows upon its face that the subscribers thereto are not jointly bound, but are only liable severally for the amount subscribed by each one; and the largest amount thus subscribed by any one being only $500, this court has no jurisdiction. (4) Because the declaration shows that all the subscription is the property of plaintiff, and does not show that they have made any effort to collect same, or that the same is not collectible, and is a trust fund for creditors. And for other good and sufficient causes."

The demurrer was sustained and the declaration dismissed at the plaintiff's cost.

The plaintiff concedes that, if the contract is several, the circuit court did not have jurisdiction, but insists that the contract is joint and several, and lays particular stress on certain language in the instrument, such as "hereby agrees with the undersigned subscribers hereto, party of the second part," and "We, the subscribers hereto, agree to pay the above amount," and "there shall be no waiver of original and joint liability until the contract price is fully paid." If we take in our view the whole paper, it is plain that the plaintiff is engaged in the business of furnishing machinery and material for erecting a plant for the manufacture of butter and cheese, and of constructing and putting in operation creameries, in such localities as can furnish supplies of milk adequate for the successful operation of such industry; that, to push its trade, it sends out its agents into rural districts, and to country villages, to promote the organization of associations to purchase the necessary plant, pay for its erection, and have set to work these creameries; that, in the course of their canvassing, the agents of the plaintiff introduced themselves and their business scheme to some of the defendants, at Myrtle, Miss.; that, when some of the defendants had consented to take a part in the enterprise, the body of the contract declared on was prepared by filling up a printed blank, or making a copy in writing of such a blank form, with the blanks duly filled, and was signed by, or already bore the signature of, the officer of the plaintiff company. In this body of the contract appeared the language, "Said building shall be constructed and equipped in substantial accordance with the specifications indorsed hereon." The specifications for the construction of the building and equipment were indorsed thereon, and just following these specifications appears the long sentence, the concluding line of which, separated from the rest of the sentence by a comma only, is the language, "there shall be no waiver of original and joint liability until the contract price is fully paid." As a preface to this contract and specifications, doubtless, then appeared, as it does now, the agreement to select a committee of one, who, at the expense of the plaintiff, was to visit the Elgin district, in Illinois, etc. Then, with this project for a contract and an incorporation of the subscribers,—an instrument which eminent judges have construed differently, and of which other eminent judges have said, "The question of the proper construction is one by no means free from difficulty" (Davis v. Shafer, 50 Fed. 764; Manu-

facturing Co. v. Barber, 51 Fed. 148; Id., 18 U. S. App. 476, 9 C. C. A. 79, and 60 Fed. 465),—the promoter or promoters obtained the signatures, to the aggregate number of 42, on a page or blank just under the signature of the officer of the plaintiff, and under the heading:

"Name of Subscribers.  No. of Shares.  Amount of Stock after Incorporation."

Is it reasonable to suppose that the defendant M. S. Smith, who, under these circumstances, subscribed for one-quarter of one share ($25), conceived the thought that he was promising to pay the plaintiff $5,250, payable in cash when the factory is completed? It is clear to us that the minds of the subscribers did not meet the mind of the plaintiff on any such proposition as that. Dwelley v. Dwelley, 143 Mass. 509, 10 N. E. 468; Landwerlen v. Wheeler, 106 Ind. 523, 5 N. E. 888; Bish. Cont. § 575; Price v. Railroad Co., 18 Ind. 137; Frost v. Williams (S. D.) 50 N. W. 964; Davis v. Belford, 70 Mich. 120, 37 N. W. 919; Gibbons v. Grinsel (Wis.) 48 N. W. 255.

We conclude that the circuit court rightly sustained the demurrer on the first ground, and dismissed the declaration for want of jurisdiction. The judgment of the circuit court is affirmed