CASE 63.—ACTION BY JOHN F. PETERSON, T. A. BEAVIN
AND JOHN M. MAHON AGAINST THE CHICAGO
BUILDING & MANUFACTURING COMPANY.—April
30, 1909.

# Chicago Bldg. & Mfg. Co. v. Peterson

Appeal from Marion Circuit Court.

I. H. THURMAN, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Reversed.

1.  Corporations—Subscription to Stock—Construction.—A contract was entered into between subscribers to a voluntary association and a manufacturing company, whereby the subscribers each agreed to subscribe to one share of stock, and the company agreed for a certain price, to be paid from the subscriptions, to erect a butter factory, the balance of the subscriptions to be delivered to a corporation which was to be formed by the subscribers, and provided that for any unpaid or deferred balance of subscription all delinquent subscribers should be jointly liable, that as soon as the corporation was formed, stock certificates should be issued to each paid-up stockholder, and that pursuant to the laws of his state, etc., each stockholder should be liable for the amount of stock set opposite his name, and no more. Nine subscribers to one share, each of the par value of $100, refused to pay their subscriptions. Held, that they were jointly and severally liable for the total amount due from them, the provisions for limitation of liability to the amount of stock subscribed by each having reference solely to the rights and liabilities of stockholders in the corporation which was to be formed.

2.  Corporations—Subscriptions to Stock—Construction.—As each subscriber could extinguish his liability by paying the amount of his subscription, there was no liability on the part of a single subscriber for the whole amount to be paid the building company; the liability of the subscribers being several, unless they elected to make it joint by becoming delinquent.

3.  Appeal and Error—Decision Reviewable—Court of Appeals—Amount in Controversy.—The liability of each of the nine delinquents being for the entire $900 the Court of Appeals had jurisdiction of appeals, in actions brought by them against the building company to have their subscriptions declared void.

Chicago Bldg. & Mfg. Co. v. Peterson.

4.  Subscriptions—Construction.—Where a subscription paper,
    signed by subscribers to stock in an enterprise, consisted of
    one sheet of paper folded so as to make four pages, the first
    page containing the specifications of the building the other
    party to the contract proposed to erect; the second page con-
    taining the contract between the subscribers and the other
    party; the third page containing blank columns in which to
    insert the names of the subscribers, and the numbers of
    shares of stock subscribed for by each, presenting, at the top
    of the page over one column, the words "names of stock sub-
    scribers," over the next words "numbers of shares," and over
    the next "amount of stock subscription": and the fourth page
    containing a diagram of the factory to be erected—held, that
    the paper embraced a single contract, the page containing
    the subscribers being their acceptance of the terms thereof.
5.  Corporations—Stock  Subscriptions—Right  of  Subscriber  to
    Withdraw.—Where numerous persons agreed with each other
    and with a building company that they would pay the amount
    of stock subscribed by them to establish a butter factory, and
    when the plant was completed by the building company they
    would organize themselves into a corporation, none of them
    could, in the absence of fraud or other good cause, withdraw
    before the corporation was formed, and avoid payment of his
    subscription.
6.  Corporations—Subscriptions  to  Stock—Validity—Failure  to
    Read Before Signing.—That persons signing a written con-
    tract of subscription to stock failed to read or understand it
    before signing would not relieve them from liability there-
    on in the absence of fraud.

JOHN McCHORD for appellant.

W. W. SPALDING, H. W. RIVES and P. K. McELROY for ap-
pellees.

No briefs record out of office.

OPINION OF THE COURT BY JUDGE CARROLL—Revers-
ing.

These three appeals, involving the same questions
of law, will be disposed of together.

In July, 1908, the appellant company, which was
engaged in erecting creamery or butter factories,
sent one of its agents to St. Marys, in Marion coun-
ty, for the purpose of interesting the farmers of that
community in establishing a factory. The agent was
successful in securing 55 persons to subscribe for one
share of stock each of the par value of $100. The

subscription paper signed by all of the subscribers consisted of one sheet of paper, folded so as to make four pages. The first page contained the specifications of the building the manufacturing company proposed to erect; the second page contained the contract between the company and the subscribers; the third page contained blank columns in which to insert the names of the subscribers and the number of shares of stock subscribed for by each. At the top of this page there is printed over one column the words "names of stock subscribers," over the next, the words "number of shares," and over the next "amount of stock subscription." The fourth page contained a diagram of the factory. The contract on the second page reads in part as follows: "Witnesseth: That the first party hereto until full and final payment of this contract is a voluntary association of persons in and around the city of St. Marys, county of Marion, and State of Kentucky, and known as the St. Marys Creamery Association, and who will subsequently organize themselves into a going corporation, to permanently conduct the creamery business as contemplated herein. The second party hereto is the Chicago Building & Manufacturing Company, manufacturers and builders, doing a manufacturing and wholesale business solely from Chicago, Illinois. On the 6th day of January, A. D., 1908, the said parties execute the following contract, to-wit: In consideration of the entire purchase price of forty-nine hundred and fifty ($4,950) dollars, which first party herein pledges itself to pay in cash or equivalent note, as hereinafter specified, second party and successors agree as follows: To devise, erect, equip and deliver, on land hereafter to be acquired, a but-

ter factory, at or near St. Marys, Ky., to be delivered at any time within ninety days from date of final approval to said contract, unavoidable accidents and delays excepted. (Then follows a description of the factory to be erected.)   First party and successors further agree as follows:   On notice from second party to appoint a building committee, consisting of not more than five persons, with conclusive authority to represent first party from date of appointment, till final settlement and permanent organization of the future corporation.   Within three days thereafter said committee, at expense of first party, shall procure and purchase in fee simple suitable level land with good legal title and to furnish thereon, in time for the builder, suitable water for direct connection with pump for the needs of said factory, and properly assign and describe said site to second party, to be held in trust for first party till full discharge of this contract agreement by first party.   Said committee shall inspect work and material during construction and shall specify in writing to second party any defects therein, if any, at occurrence, to be remedied within a reasonable time.   At date of delivery said committee shall meet with a representative of second party and together compare the details of said factory, and if it is in substantial accordance with the within contract and specifications, with the machinery and fixtures set up in a workmanlike manner, second party's discharge of this contract is complete and payment is due thereunder. * * * For any unpaid or deferred balance of subscription, all delinquent subscribers are jointly liable and first party agrees that any failure in any of its covenants may be construed as a joint and total breach of the within con-

tract. * * * All remaining subscriptions or note balance, after said association's entire indebtedness to second party has been so paid, shall be duly assigned to the said corporation for a working capital. After payment and delivery has been made, as above, said association shall organize a co-operative society under State law, fixing aggregate amount of stock at not less than the amount subscribed hereto, represented by stock certificates for $100 each. Said certificates will then be issued to each paid-up stockholder, in proportion to his interest, it being especially agreed that there can be no default, withdrawal or transfer of subscription or stock until lawfully entered on the books of said future corporation by its regularly elected officers. Pursuant to the laws of his State and these conditions, it is agreed that each stockholder shall be liable for the amount of stock set opposite his or her name and no more."

On September 1, 1908, the manufacturing company executed the following additional obligation: "The Chicago Building & Manufacturing Company, of Chicago, Illinois, hereby agrees that it will carry out in full the conditions of its contract made July 6, 1908, with the subscribers to the St. Marys Creamery Association and guarantees that it will collect by suit or otherwise the subscription contract amounting to $5,500.00, and will turn over to said association through its duly authorized agent the surplus of $550.00 as a running fund, as soon as collection is made by said company or as soon as said manufacturing company has had reasonable time to coerce payment of said subscription list. Said manufacturing company guarantees the collection of said subscription list for the purpose of satisfying the cost of the creamery and said working fund."

It appears that 46 of the subscribers paid their sub-scriptions in full, and on the 21st day of September, 1908, a committee of 5, appointed by the subscribers to examine the factory that had just been completed by the company, certified in writing that it was finished according to the specifications and contract, and accepted the same. But, previous to this time, and on August 27, 1908, the appellees instituted sep-arate actions against the appellant company, in which they asked to have their several subscriptions de-clared void, and that the company be required to erase and cancel their respective names from the sub-scription list, and be perpetually enjoined from as-serting any claim against either of them on account of said subscription. They sought this relief upon the ground that the agent who secured the subscriptions practiced a fraud upon the subscribers by represent-ing, as an inducement to obtain their subscriptions, that the company was going to erect a creamery at St. Marys, and organize the company to operate it, and that the stock would be $100 per share, and the cost of the plant $4,950, and that the company would guarantee dividends of 6 per cent. on the stock, and, further, that the president of the Marion National Bank had agreed to take two shares of stock, and to furnish to the creamery the milk of 20 cows. They averred that in subscribing they did not know they were signing any contract as individuals, but sup-posed they were obligating themselves to take stock to the amount of their subscription in the company that would be organized. When the case came on for trial, the company filed an answer and counterclaim, in which, after traversing the averments of the petition, and setting up the facts hereinbefore stated in ref-

erence to the completion of the creamery, and its acceptance by the subscribers, it asked judgment against each of the appellees for the amount of their respective subscriptions. A general demurrer to this pleading was sustained, and thereupon an amended answer, counterclaim, and cross-petition was filed. In this pleading it was averred that all of the subscribers had paid their subscriptions, except 9, and that each of these 9 had filed suits similar to the ones brought by these 3; that of the $4,600 received from the paying subscribers, it had retained $4,050, and had paid $555 to the creamery company, leaving $900 due to it as a balance on the construction price of the factory. It further averred that the paying subscribers had in October, 1908, organized a corporation under the laws of the State for the purpose of operating the creamery. It set up the stipulation in the contract providing that "For any unpaid or deferred balance of subscription, all delinquent subscribers are jointly liable and first party agrees that any failure in any of its covenants may be construed as a joint and total breach of the within contract," and asked that the 9 actions brought by the 9 delinquent subscribers be consolidated, and that it have judgment against each and all of them jointly and severally for the sum of $900. To this pleading a demurrer was sustained, and a judgment entered canceling each subscription, and enjoining the manufacturing company from asserting any claim against the subscribers on account of their several subscriptions.

The first question raised is, Has this court jurisdiction of the appeal? It is the contention of appellees that each subscriber was only liable for the amount

of his subscription; and, as each subscription was only for $100, this court has not jurisdiction. On the other hand, the manufacturing company insists that each of the delinquent subscribers is jointly and severally liable for the total amount of delinquent subscription, and hence it was entitled to judgment against each of them jointly and severally for $900, and so this court has jurisdiction, and the power to review the judgment dismissing its answer, counterclaim, and cross-petition which sought judgment for this amount. In addition to this it is said that, as the actions by the appellees were not brought for the recovery of money or property, but for the purpose of having their subscriptions canceled, this court would have jurisdiction even though it be conceded that the amount in controversy in each case was only $100. In the view we have of the matter it does not seem necessary to pass upon the question whether this court would have jurisdiction if the only relief sought and granted was the cancellation of a subscription for $100. In our opinion, under the terms of the contract, each of the delinquent subscribers was liable, jointly and severally, for the total amount due by the delinquents. This seems to be the plain reading of the contract. Nor is there any conflict between the clause in the contract containing this condition and the clause stipulating, "Pursuant to the laws of his State and these conditions, it is agreed that each stockholder shall be liable for the amount of stock set opposite his or her name and no more." This last provision has reference to the rights and liabilities of the stockholders in the corporation it was contemplated and agreed in the contract should be created. Whereas the provision that "for any un-

KENTUCKY REPORTS. [Vol. 133.

Chicago Bldg. & Mfg. Co. v. Peterson.

paid or deferred balance of subscription all delinquent subscribers are jointly liable'' has reference to the liability of the subscribers in the voluntary association that was organized for the purpose of erecting the factory. Under this construction, which seems to be the reasonable one, both clauses may stand, and the contract as a whole remain a harmonious instrument.

In its inception, and when the contract in controversy was signed by the subscribers, it was merely a voluntary association; but it was contemplated, and so provided in the contract, that the members of this voluntary association "will subsequently organize themselves into a going corporation to permanently conduct the creamery business as contemplated herein." In the corporation to be organized the manufacturing company had no interest or concern. It was only interested in obtaining the requisite number of subscriptions to the voluntary association to guarantee the purchase price of the plant it proposed to erect. The whole paper must be construed as one contract, and the page containing the names of the subscribers be treated as their acceptance of the terms of the contract. We find nothing unconscionable or against public policy in this contract. The manufacturing company obligated itself to furnish for a specified sum a plant equipped according to the plans and specifications that were a part of the contract, and the subscribers bound themselves to pay for the stock they took in the association. They further agreed that, if any of them failed to pay when due the amount subscribed, each subscriber so in default would be jointly and severally liable for all delinquent subscriptions. In other words, each sub-

scriber said, "I will either pay the amount I have subscribed, or if I fail to pay, I will become responsible for all the others who fail to pay their subscriptions." Any subscriber could extinguish his liability by paying the amount of his subscription. It was only in the event that he failed to pay his subscription that his obligation to become responsible for the other delinquent subscriptions attached. So that there is no foundation in fact for the argument presented by counsel for appellees that each subscriber became liable for the whole amount they agreed to pay the manufacturing company. The person who first subscribed for one share of stock, as well as the person who last subscribed for a share, could relieve himself from any further liability by paying, when due, the amount subscribed. They did not become liable for any other unpaid or deferred subscription unless they were also delinquent. The clause covering this feature of the contract is plain. It reads: "For any unpaid or deferred balance of subscription, all delinquent subscribers are jointly liable." Except for this clause, which was evidently inserted for the purpose of inducing all of the sub scribers to pay the amount of their subscription, no one of them would be liable for any more than the amount he subscribed. The liability of the subscribers was a several one, unless they elected to make it a joint one by becoming delinquent. The contracts construed in Davis v. Belford, 70 Mich. 120, 37 N. W. 919, Gibbons v. Grinsel, 79 Wis. 365, 48 N. W. 255, and Davis, etc., Co. v. Barber (C. C.) 51 Fed. 148, did not contain the joint liability clause we are considering.

The further argument is made that the appellees had the right, at any time before the voluntary as-

sociation was converted into a corporation, to· with-
draw their subscriptions; and, as this action was in-
stituted in August, 1908, and the corporation was not
organized until October, 1908, it is said that appellees
had the right to withdraw, and that after their with-
drawal they could not be proceeded against on their
subscriptions; that the remedy, if any, against them
would be an action in damages.   There is some au-
thority supporting this view.   Bryant's Pond Steam
Mill Co. v. Felt, 87 Me. 234, 32 Atl. 888, 33 L. R. A.
593, 47 Am. St. Rep. 323; Davis v. Bronson, 2 N. D.
300, 50 N. W. 836; 16 L. R. A. 655, 33 Am. St. Rep.
783.  It does not, however, seem necessary that we
should express an opinion as to the right of a sub-
scriber to stock in a proposed corporation to with-
draw his subscription before the corporation is or-
ganized.   That question is not before us on this
record.  The subscribers to the contract we are con-
sidering bound themselves to pay to the manufac-
turing company a certain sum in consideration of
its agreement to erect and equip a factory according
to the specifications agreed upon.  Upon this state of
facts we are of the opinion that, in the absence of
fraud, mistake, or some other good reason that would
authorize a cancellation of the subscription, the sub-
scribers could not defeat the purpose of the associa-
tion, or relieve themselves from liability to the com-
pany, simply by declaring that they intended to with-
draw from the association.  In Twin Creek & Cole-
mansville Tp. R. Co. v. Lancaster, 79 Ky. 552, 3 R. 368,
Lancaster and others subscribed stock in a corpora-
tion proposed to be organized for the purpose of con-
structing turnpike roads.  After the company was
organized, some of the subscribers declined to pay,

and an action to recover the amount of their subscription was instituted against them. In the course of the opinion holding them liable, the court said: "The purpose of signing the subscription was to enable the subscribers to organize and form a corporation that would inure to the benefit of all. It was in fact a mutual agreement by which each subscriber pledged himself to pay a certain sum of money in order to perfect the organization and complete the enterprise. A subscriber or partner in an intended undertaking, subscribing an agreement to take measures to carry out the same, cannot discharge himself from liability, or repudiate the concern to which he may have pledged himself. This was not in fact an agreement to subscribe, but it was a subscription without any other condition than the organization of the company or corporation. * * * There was no other condition annexed. * * * The agreement in this case is not a mere voluntary donation by the appellees, but an agreement, in effect, to form an association which, when organized and the enterprise completed, will vest the parties with a right of property that will advance their private, as well as the public, interests; and in such a case we regard the doctrine as well settled that it is too late after the act of incorporation takes place, whether the work has or not been undertaken, to withdraw from the association." This case was followed in Bullock v. Falmouth, etc., Tp. R. Co., 85 Ky. 185, 3 S. W. 129, 8 R. 835, and Cadiz R. Co. v. Roach, 114 Ky. 934, 72 S. W. 280, 24 R. 1761. And we see no difference in principle between the rule announced in those cases and the one we have applied in this. The parties to this contract agreed, not only with the manufacturing company, but with each other, that

they would pay for the purpose of establishing the proposed enterprise the amount of stock subscribed, and further agreed that when the plant was completed they would organize themselves into a corporation. Thus a complete and binding contract was entered into by each of the subscribers, and neither, in the absence of fraud or other good cause, had the right to withdraw from the corporation, or fail to pay his subscription and thereby defeat the ends intended to be accomplished when the contract of subscription was entered into. Cross v. Pinckneyville, 17 Ill. 54; Hughes v. Antietam Mfg. Co., 34 Md. 316; Johnson v. Wabash R. Co., 16 Ind. 389; Gibbons v. Bente, 51 Minn. 499, 53 N. W. 756, 22 L. R. A. 80. The manufacturing company was only interested in the subscriptions to the extent of the contract price of $4,950. After this sum had been collected, the remainder of the subscriptions belonged to the voluntary subscribers, and was intended to be, as expressed in the contract, turned over to the corporation for a working capital. If one of the subscribers could withdraw, others could, of course, do the same, and the result would be that the purpose for which the association was formed would be defeated. It would be the merest child's play to permit persons to enter into voluntary agreements of this kind one day and repudiate them the next. It may be, as said by counsel for appellees, that if these subscribers had known the terms of the contract, they would not have subscribed to the enterprise, but the fact that they did not see proper to read or understand the contract is no reason why they should be released. Their failure to read it is another of the many illustrations that come before courts that persons entering into con-

tracts read them after they have signed them, in place of before.

The judgment in each case is reversed, with direc-tions to overrule the demurrers to the pleadings filed by appellant and for other proceedings not inconsistent with this opinion.