Floyd v. Christian Church Widows and Orphans Home of Kentucky.

Same v. Transylvania University.

Same v. Kentucky Female Orphans School of Midway.

June 25, 1943.

As Modified on Denial of Rehearing Dec. 10, 1943.

Charles I. Dawson and Woodward, Dawson & Hobson for appellant.

Laurence B. Finn and Finn & Orendorf for appellees.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

On the date herein shown, Henry A. Floyd and Nannie H. Floyd, his wife, executed and delivered the three following writings:

"For and in consideration of our interest in Christian benevolence and in consideration of other gifts and pledges being made for the building and endowing of the Christian Church Widows and Orphans Home, located in the City of Louisville, Kentucky, and of which J. S. Hilton is the Superintendent, we hereby promise to pay to the said Christian Church Widows and Orphans Home the sum of Twenty-five hundred ($2,500.00) Dollars. This amount is due and payable sixty days after the death of the survivor of us. Bequests amounting to $3400.00 to our family as set out in the will of Henry A. Floyd are to be preferred to this pledge.

"Done at Oakland, Kentucky, this September 24, 1924.

"Henry A. Floyd
"Nannie H. Floyd

"Witness
"Edgar C. Riley"
"For the Cause of Christian Education
"Sept. 24, 1924

"For the purpose of promoting Christian Education, and in consideration of the gifts of others, the undersigned hereby agrees to pay to Transylvania University, at Lexington, Kentucky Five Thousand Dollars ($5,000.00) payable as follows: 60 days after the death of the survivor of us. Bequests in my will amounting to $3,400.00 to our relatives are preferred to this pledge.

| | | | |
|---|---|---|---|
| Church | Oakland | Signed | Henry A. Floyd |
| | | | Nannie H. Floyd |
| County | Warren | Address | |
| | | | Oakland, Ky." |
| Solicitor | Riley | | |

"For and in consideration of our interest in Christian Education and in consideration of the gifts and pledges of others in the campaign now in progress for the enlargement and endowment of the Kentucky Female Orphans School of Midway, Kentucky, we hereby promise to pay to the said Kentucky Female Orphans School the sum of Twenty-five hundred ($2,500) Dollars. This amount is due and payable sixty days after the death of the survivor of us. Bequests amounting to $3,400. to our family as set out in the will of Henry A. Floyd are to be preferred to this pledge.

"Done at Oakland, Kentucky, this September 24, 1924.

"Henry A. Floyd
"Nannie H. Floyd

"Witness
"Edgar C. Riley"

A campaign was in progress to raise $800,000 for Transylvania University, and Edgar C. Riley, whose name appears on two of the instruments as a witness and on the other as solicitor, was the promotional secretary of Transylvania University, and later became business and promotional director of the Kentucky Female Orphans Home. He had called upon the Floyds at their home in Oakland for the purpose of securing a contribution to the University fund, and, according to his testimony, Mr. Floyd, after signing the pledge to the University, stated that he and his wife were interested in other institutions of the Christian Church in Kentucky which were attempting to raise money for the expansion of their plants and the enlargement of their endowment funds. Thereupon Riley wrote on a typewriter the

quoted pledges to the Widows and Orphans Home and the School, except the words and figures signifying the amounts of the pledges and the sentences relating to the preferment of the bequests to the Floyd family. The latter sentences were inserted by Riley with pen and ink before the instruments were signed. The pledge to the University was on a printed form altered with pen and ink by Riley at Floyd's direction so as to make it payable after the death of Floyd and his wife, and after the family bequests aggregating $3,400 had been satisfied. Floyd's intentions, as they were understood by Riley, and the reasons for the adoption of the method employed to express them, are illustrated by the following excerpt from Riley's testimony:

"Q. What I mean is, who advanced the idea that this pledge would not be payable except under the conditions and at the time as indicated in the pledge: You or Mr. Floyd? A. At the first conference with Mr. Floyd the week before I learned that he was not interested in making a cash pledge but was interested in making an estate note pledge, and in the second conference we discussed wholly the form of these estate note pledges and similar pledges that were made by others."

Mrs. Floyd died in May, 1937, intestate and without leaving any estate. Her husband died in September of the same year, leaving an estate valued at approximately $21,000 and a will, executed a few days before his death, by the terms of which he revoked all previous wills which he had made, and directed that the residue of his estate, after the payment of his debts and a few minor bequests, be distributed share and share alike among his brothers and sisters and Mrs. H. G. Floyd, who, the will recited, was not related to the testator by blood. On March 20, 1939, the three appellees named in the caption instituted separate suits against the executor of Henry A. Floyd's will in which they alleged the execution and delivery on September 24, 1924, of the "notes," the death of Henry A. Floyd and the previous death of his wife, the terms of his will, the value of the estate and that enough remained after the payment of debts, and bequests aggregating $3,400 to his relatives, to pay the "notes" sued on, and that demand for their payment had been made of the executor and refused. It is unnecessary to recite the details of the pleadings further than to state that the defenses relied on were

eventually raised by affirmative pleas, controverted of record by agreement, embracing the following allegations:

"Paragraph 2  By way of further affirmative defense to the plaintiff's petition herein, the defendant states that the paper set up and sued on in this action is not by its terms, and was not intended by its makers to be, a promissory note for the sum of Twenty-five Hundred Dollars ($2,500.00), or an executory obligation of any character irrevocably binding the makers thereof to pay the sum of Twenty-five Hundred Dollars ($2,500.00) to the plaintiff sixty (60) days after the death of the survivor of said makers, but was solely testamentary in character, and not having been executed with the formality required in the execution of wills, and therefore being incapable of probate, and not having been probated, said instrument is wholly void and unenforceable.

"Paragraph 3  If the defendant is in error in his contention, as set out in paragraph 2, as to the nature, character, and effect of the instrument sued on, then he says that the paper sued on was nothing but a gratuitous promise to make a donation to the plaintiff, as stated in that instrument, which promise was revokable by Henry A. Floyd and his wife at any time during their lifetime, or by their death, and same was revoked as a matter of law by the death of said Floyd and his wife, as alleged in the petition.

"Paragraph 4  If the defendant is mistaken in his allegations set out in Paragraphs 2 and 3 hereof as to the character and effect of the instrument sued on, and same by its terms is and was intended by its makers to be a promissory note, or any other kind of irrevocable promise to pay to the plaintiff Twenty-five Hundred Dollars ($2,500.00) at the time and in the manner therein stipulated, nevertheless same is void and unenforceable for the reason that the only consideration given therefor was the alleged consideration stated in the instrument, which was not a valuable consideration sufficient to support same, and delivery of same was wholly without valuable consideration."

The evidence failed to show that the Floyds induced or were induced by any other contributor to subscribe. It also failed to show that any of the three institutions performed any act or incurred any obligation which it

would not have performed or incurred had the pledges sued on not been made. By agreement the actions were heard together and disposed of by one opinion in which the Chancellor held that the instruments were not testamentary in nature and were supported by a "sufficient consideration as to render them enforceable." Pursuant thereto, judgments were rendered against the executor for the principal amounts claimed with interest from December 1, 1937. These appeals followed.

Claiming that since the instruments showed on their face that they were to be paid after the death of the Floyds, and then only in the event their unconsumed estates, after the payment of bequests to relatives aggregating $3,400, were sufficient for that purpose, the instruments were necessarily testamentary in character, appellant invokes the universally recognized principle thus aptly expressed in Barnum v. Reed et al., 136 Ill. 388, 26 N. E. 572, 574: "If the gift does not take effect as an executed and completed transfer to the donee, either legal or equitable, during the lifetime of the donor, it is a testamentary disposition, good only when made by a valid will."

Anticipating the argument, vigorously pressed by the appellees, that the instruments were not gifts but promissory notes executed for valuable considerations, and, hence nonrevocable, appellant cites numerous authorities, among them Williston on Contracts, Sect. 116, Page 406, Volume 1, to the effect that subscriptions to charitable institutions are not supported by a sufficient consideration to render them enforceable when the consideration consists merely of the prior or subsequent subscriptions of others.

Some courts contrary to the holdings of the English and Canadian tribunals, which, from the beginning have frowned upon the enforceability of such subscriptions, have treated the express or implied undertaking of the charity to carry out or perform the functions for which it was chartered, or to devote the proceeds of the subscriptions to those purposes, as a sufficient consideration to render such subscriptions enforceable. Two of the earlier decisions of this Court (Collier v. Baptist Education Society, 8 B. Mon. 68; and Trustees of Kentucky Female Orphan School v. Fleming, Ex'r., etc., 10 Bush 234) apparently upheld that view, but later cases, not involving charitable subscriptions, have un-

equivocally held that an agreement to perform an act that one is otherwise obligated to perform, is not a sufficient consideration to render enforceable an undertaking given in return therefor. Mason Construction Co. v. Cosmos Portland Cement Co., 248 Ky. 782; 59 S. W. (2d) 1016; Gray v. Greer, 253 Ky. 809, 70 S. W. (2d) 683; Wallace v. Cook, 190 Ky. 262, 227 S. W. 279; McDevitt v. Stokes, 174 Ky. 515, 192 S. W. 681, L. R. A. 1917D, 1100. Other courts, also including our own, doubtless influenced by motives of public policy, have, seemingly, assumed that the prior and subsequent subscriptions of others constituted a sufficient consideration to uphold a subscription to a charitable or public enterprise. Still others, and it would seem more logically, invoking the doctrine of ''Promissory Estoppel,'' have held such subscriptions to be enforceable only where it is shown that the charity was thereby induced to incur obligations or undertake enterprises in reliance thereon. For a full discussion of the authorities on this subject see the annotation to the case of I. & I. Holding Corporation v. Gainsburg, 115 A. L. R. at page 589, and the preceding annotations, which it supplements, to the cases of Dalhousie College v. Boutilier and In re Griswold, reported respectively in 95 A. L. R. at page 1298, and 38 A. L. R. at page 858. Although this Court, in common with the majority, has, on occasions, successfully applied its ingenuity to the task of finding sufficient considerations to support and justify the enforcement of what, in the contemplation of the lay mind, at least, were merely promises to give to worthy causes, we feel that since the exigencies of the case, if we should hold that the recited considerations were valuable, would require us to enforce the instruments sued on, irrespective of whether or not they were testamentary in character, a due regard for the public policy, which demands a strict enforcement of the Statutes requiring testamentary dispositions of property to be made by holographic or formally executed wills, requires that we review, and, if necessary, dissent from the current theory that subscriptions to charities should be held enforceable under all circumstances.

To attempt an analysis of the numerous authorities from other states bearing on this subject would result in extending the length of this opinion beyond reasonable bounds. Those interested in the various theories advanced by the Courts in their attempts to escape the

ancient rule that a valuable consideration is necessary to render a promissory obligation enforceable, may find the subject ably and comprehensibly treated in the article by Professor Robert L. Taylor, published in Vol. 29 (November 1940) of the Kentucky Law Journal. Seemingly recognizing the futility of attempting to reconcile the requirements of the law of contracts with a public policy which demands that subscriptions to charities be held irrevocable, he concludes his article with the suggestion that this Court should "avoid the precarious course that some courts have taken," and "establish itself as a court unafraid to legislate judicially when considering a problem which so vitally involves the public welfare." If we should concede that public policy makes such a demand, the fact remains that the principle that contractural undertakings to be performed in the future must be supported by valuable consideration in order to be enforceable, is fundamental in the common law which was adopted by this Commonwealth at its birth, and hence, while it is our privilege to construe it, it is not our prerogative to ignore it. Appellees rest their cases largely, as did the Chancellor wholly, on the opinions of this Court in the cases of Central University v. Cox's Ex'r, 136 Ky. 260, 124 S. W. 299; McDonald's Ex'r v. Transylvania University, 274 Ky. 168, 118 S. W. (2d) 171, 172; and the article by Professor Taylor above referred to. In the Cox case, which was a settlement suit, we held that the Chancellor erred in sustaining a demurrer to the counterclaim and cross-petition of the University, seeking a recovery on a note executed by the decedent, Cox "to be paid at my death, or at the death of my wife should she survive me and provided there is enough of my estate not disposed of to meet the subscription." The opinion reversing the judgment was predicated upon the rule that a promise may be conditional and become enforceable upon the fulfillment of the condition, and the Court's disagreement with the Chancellor's view that the expression in the note "not disposed of" meant "not disposed of in any manner," and that since Cox and his wife had disposed of all the property by will, there was not enough of Cox's estate not disposed of to meet the subscription. The McDonald case was an attack by McDonald's executor on the following instrument executed by his testator: "For and in consideration of other pledges being made in the campaign now in progress for Transylvania University

* * * I hereby promise to pay to said University the sum of Twenty-five Hundred Dollars for the purpose of founding the Jasper McDonald perpetual scholarship. This pledge is to be paid at my death. Should I make any payments on it before that time, I am to receive annuity bond for same. Annuity bonds to be issued to my wife should she survive me."

According to the opinion, the instrument was attacked "because of lack of consideration" and because it "was executed under undue influence, and the maker's mental condition at the time of its execution was such that he did not realize its import and effect." However, "the parties stipulated that the only issue to be determined under the pleadings was whether or not testator was mentally competent, or whether execution was procured by undue influence." While this Court further said, "That the document constituted an executed contract, there can be little doubt, though it may not be placed in the same class as a will, or a deed, and may not be said to be enveloped with the same dignity or solemnity as such instruments," it is apparent from a reading of the opinion that the only questions considered or decided were those embraced in the stipulation.

For the reasons cited above we do not regard either of the two cases referred to as controlling authority on the question now under discussion. As said in the case of Webster v. Fall, Secretary, et al., 266 U. S. 507, 45 S. Ct. 148, 149, 69 L. Ed. 411: "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." See, also, in this connection Rex Coal Co. v. Campbell, 213 Ky. 636, 281 S. W. 1039. Thus we may consistently hold that the theory that mutual subscriptions to a charitable institution may provide a sufficient consideration to render them enforceable has not been determined by this Court so as to render available to appellees the doctrine of stare decisis, notwithstanding the fact that mutual agreements to donate land for the construction of a railroad, to donate funds for the construction of a highway, and to subscribe to stock of a corporation have been upheld apparently on this, as well as other grounds. Curry v. Kentucky Western R. Co., Ky., 78 S. W. 435; Eagles, etc., v. Hafendorfer, 204 Ky. 696, 265 S. W. 35; Tully v. Cane Run & Kingsmill Turnpike Road Co., 5 Ky. Op. 330; Twin Creek & C. Turnpike Road Co. v.

Lancaster, 79 Ky. 552; Chicago Building & Manufacturing Co. v. Peterson, 133 Ky. 596, 118 S. W. 384; Gannon v. Grayson Water Co., 254 Ky. 251, 71 S. W. (2d) 433. How far the Court in these cases involving commercial transactions may have been influenced by a consideration of the benefits which the subscribers were, expressly or impliedly, to receive in return for their subscriptions, it is not necessary for us to determine.

In announcing our conclusion that no valuable consideration for the execution of the instruments sued on existed, and hence that they are unenforceable as promissory obligations; we do not mean to be understood as holding that where there is an agreement by individuals to subscribe funds for the accomplishment of an enterprise which would not otherwise be undertaken or continued, the subscribers are not bound. Neither do we hold that where charities have incurred obligations, expended money or performed undertakings which they would not have otherwise incurred, expended or performed, the subscriptions are unenforceable, even though given without regard or reference to the subscriptions of others. On the contrary, we perceive no reason for doubting their validity or for withholding the application of the doctrine of promissory estoppel in any case where the facts disclosed by the pleadings and proof justify its application. That doctrine, in the language of Section 90, Restatement of the Law of Contracts, is: ''A promise which the promissor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.''

Much has been written concerning the desirability, from the standpoint of public policy, of holding all subscriptions to charities enforceable, and, when necessary, inventing considerations sufficient for that purpose. We have already answered that suggestion in part. But, in considering all the possible results from such a course, the inquiry arises, whether, after all, it is beneficial to society to confer upon an institution, no matter how worthy, the rights of a creditor, and the consequent power to compel one who has promised to donate to its cause, to fulfil his pledge, irrespective of how large a portion of a diminished or insolvent estate it might consume, and regardless of whether the institution has

changed its position for the worse in reliance upon the subscription. Therefore, while our conclusions may run counter to the concept of public policy which has influenced the decisions of many courts, we do not feel that our holding that an actual, rather than an illusory consideration, or at least an estoppel of the promisor to object, is necessary to render a charitable subscription enforceable, is injurious to the public welfare.

That the instruments sued on are testamentary in character is but another way of saying that while they manifest the donative intent of their makers, they neither confer nor evidence an intent to confer upon the donees any property, right, or benefit during the lifetime of the makers. Little's Adm'r v. Sizemore, 208 Ky. 135, 270 S. W. 729; Sullivan et al. v. Sullivan, 122 Ky. 707, 92 S. W. 966, 7 L. R. A., N. S., 156, 13 Am. Cas. 163; Pelley's Adm'r et al. v. Earles, 107 Ky. 640, 55 S. W. 550; Vaughn et al. v. Metcalf, 274 Ky. 379, 118 S. W. (2d) 727; Ison v. Halcomb, 136 Ky. 523, 124 S. W. 813; Rawlings v. McRoberts, 95 Ky. 346, 25 S. W. 601.

It is not contended, nor could it be contended in the face of the authorities, that the instruments evidenced, or, by reason of their delivery, or otherwise, constituted completed, and hence valid, gifts which required no consideration to render them enforceable. That they were in the form of promissory notes executed by the donors would militate against, rather than strengthen, the claim, if such claim had been made, that they constituted valid gifts inter vivos. Graf v. Graf, 150 Ky. 226, 150 S. W. 58, Ann. Cas. 1914C, 1138; 28 C. J. p. 660. On the other hand, if the considerations for their execution had been valuable, the fact that they were made payable after the death of the makers, and then conditionally, would not have prevented their enforcement when the deaths occurred and the conditions were fulfilled, notwithstanding the testamentary intent thus manifested. Neither would they have been revocable, and thus an essential characteristic of testamentary dispositions would have been lacking. So, in the final analysis, the determining factor in the decision in this case is our conclusion that the instruments sued on are not supported by valuable considerations.

Judgment reversed with directions to dismiss the petitions.

Whole Court sitting, except Judge Sims.