# The Chicago Building & Manufacturing Company v. Beaven, et al.

(Decided June 21, 1912.)

## Appeal from Marion Circuit Court.

1. Contracts—Fraud or Mistake—Presumption.—When a written
   contract is attacked for fraud or mistake, the presumption is in
   favor of the writing, which ought not to be lightly overturned;
   and he who thus attacks it must bear the burden of clearly estab-
   lishing the fraud or mistake, by substantial and satisfactory
   proof.

2. Actionable Fraud—What Must Appear to Establish.—To estab-
   lish actionable fraud it must appear that the misrepresentation
   was of a matter of material fact at the time of the misrepresenta-
   tion; it must have been relied upon by the person whose action

is intended to be influenced thereby; and it must have been made with the knowledge of its falsity, or under circumstances which did not justify a belief in its truth.

JOHN McCHORD for appellant.

H. W. RIVES, P. K. McELROY and W. W. SPALDING for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming upon the cross appeals of Peterson, Walker and Mattingly, and reversing upon the original appeal of the Chicago Building and Manuafcturing Co.

This is the second appeal of this action. The opinion delivered upon the first appeal may be found in 133 Ky., 596, and contains a correct statement of the facts out of which the litigation grew, and the principal portions of the contract süed on.

Briefly stated, The Chicago Building & Manufacturing Company (hereinafter called The Building Company for brevity), entered into a written contract with fifty-five farmers residing in the neighborhood of St. Marys, in Marion county, whereby The Building Company agreed to erect a creamery or butter factory for the sum of $4,950. Each subscriber bound himself to pay $100 for one share of stock in a corporation to be organized, in case the contract should become effective. The contract was tentative in its nature, and only bound the subscribers thereto in the event that $5,500, which was necessary to erect the creamery and start it in business, should be raised, and certain other specified facts should be found to exist. That feature of the contract is contained in this provision:

"It is agreed by the respective parties to the attached Creamery Contract, that when the required stock has been subscribed thereto, said subscribers will meet and choose an executive committee, as provided in said contract, and they may then, if they desire, select an investigating committee, consisting of one or two of said executive committee, who shall, at the expense of second party therein, immediately visit factories erected by second party on this co-operative system. If said investigating committee, after full investigation of said factories and books of same, find that a factory run upon this system pays from 6 to 10 per cent upon the investment, and that the milk of the cow when handled by such

a factory averages at the rate of $35 to $60 per cow, in a year, then this contract shall remain in full force and effect. But if said committee certify hereon that such evidence is found to be otherwise, said attached contract shall be canceled by second party and be delivered to said committee to be by them destroyed.''

The contract further provided that in the event the foregoing facts were found to be true and the contract should become operative, the subscribers should then appoint a building committee, which should procure a suitable site for the creamery, and superintend the building of it. This portion of the contract may be found in the former opinion, on page 599.

After the $5,500 had been subscribed, an organization meeting was held in the depot at St. Marys, pursuant to a notice given to all the subscribers. It appointed a building or executive committee of its own number, which procured the site upon which the appellant subsequently erected the creamery according to the plans and specifications. In September, 1908, that committee reported as follows to appellant:

''We, the undersigned executive committee, in behalf of, and for the first party to the contract for the butter factory at St. Marys, county of Marion and State of Kentucky, do hereby certify that in company with your special agent, Mr. A. Grider, have examined in detail the said factory and have checked off the specifications, and find nothing lacking to complete the same, in accordance to said contract and specifications aforesaid, and we have this day received the keys to said factory.

''CHARLES BEAVEN,         W. M. SPALDING,
''GEORGE MATTINGLY,        W. A. WALKER,
                          B. J. LANCASTER.''

The other proceedings are well narrated in the following excerpt taken from the opinion upon the former appeal of this case, to-wit:

''But, previous to this time, and on August 27, 1908, the appellees instituted separate actions against the appellant company, in which they asked to have their several subscriptions declared void, and that the company be required to erase and cancel their respective names from the subscription list, and be perpetually enjoined from asserting any claim against either of them on account of said subscription. They sought this relief upon

the ground that the agent who secured the subscriptions practiced a fraud upon the subscribers by representing, as an inducement to obtain their subscriptions, that the company was going to erect a creamery at St. Marys, and organize the company to operate it, and that the stock would be $100 per share, and the cost of the plant $4,950, and that the company would guarantee dividends of 6 per cent on the stock, and further, that the president of the Marion National Bank had agreed to take two shares of stock, and to furnish to the creamery the milk of 20 cows. They averred that in subscribing they did not know they were signing any contract as individuals, but supposed they were obligating themselves to take stock to the amount of their subscription in the company that would be organized. When the case came on for trial, the company filed an answer and counterclaim, in which, after traversing the averments of the petition, and setting up the facts hereinafter stated in reference to the completion of the creamery, and its acceptance by the subscribers, it asked judgment against each of the appellees for the amount of their respective subscriptions. A general demurrer to this pleading was sustained, and thereupon an amended answer, counterclaim and cross petition was filed. In this pleading it was averred that all of the subscribers had paid their subscriptions, except 9, and that each of these 9 had filed suits similar to the ones brought by these 3; that of the $4,600 received from the paying subscribers, it had retained $4,050, and had paid $555 to the creamery company, leaving $900 due to it as a balance on the construction price of the factory. It further averred that the paying subscribers had in October, 1908, organized a corporation under the laws of the State for the purpose of operating the creamery. It set up the stipulation in the contract providing that 'For any unpaid or deferred balance of subscription, all delinquent subscribers are jointly liable and first party agrees that any failure in any of its covenants may be construed as a joint and total breach of the within contract,' and asked that the 9 actions brought by the 9 delinquent subscribers be consolidated, and that it have judgment against each and all of them jointly and severally for the sum of $900. To this pleading a demurrer was sustained, and a judgment entered canceling each subscription, and enjoining the manufac-

turing company from asserting any claim against the subscribers on account of their several subscriptions." (133 Ky., 601.)

Upon the former appeal the judgments were reversed, with directions to overrule the demurrers to the pleadings filed by the appellant, and for further proceedings. Upon the return of the cases they were consolidated and tried before a jury upon the issue of fraud. The jury returned a verdict against John F. Peterson for $100, the amount of his subscription; and having failed to find a verdict as between the appellant and the other eight subscribers, the cases were, by agreement, submitted to the court for trial and judgment on the evidence which had been introduced by the parties before the jury upon the trial, the judgment of the court to have the same effect, for the purposes of appeal, as the verdict of a jury and the judgment of the court regularly rendered thereon. As a question of fact the circuit judge found that the signatures and subscriptions of the eight remaining subscribers were procured by the false and fraudulent representations of J. Lester Williams, the agent and representative of the building company, who procured the subscriptions; that none of the subscribers knew of the contents of the contract at the time they signed it; and that information as to its contents and real character were fraudulently kept from them by said Williams. The circuit judge further found, as a matter of fact, that F. M. Walker and John R. Mattingly had ratified and approved the contract by their conduct and actions after they had ascertained its real nature and character. Applying the law to these findings of fact the court gave the building company a judgment against John R. Mattingly, F. M. Walker and John F. Peterson upon their subscriptions, and dismissed the building company's claim against the appellees, T. A. Beaven, W. W. Graves & Son, M. D. Burdette, John R. Mahon, B. F. Beaven and Susan Buckler. The building company appeals from so much of the judgment as dismissed its petition against the six remaining subscribers, while Mattingly, Walker and Peterson have obtained a cross appeal in this court from so much of the judgment as was against them.

The single issue involved is that of fraud. The subscribers insist that Williams procured their signatures through fraudulent representations, and as speci-

fications of the fraud practiced, they say he concealed from them the nature of the contract; that he verbally guaranteed that their stock in the proposed creamery company would net them six per cent per annum; that he falsely represented that W. G. Rogers, president of the Marion National Bank, would subscribe for two shares of stock, and supply the milk of twenty cows for the creamery. Williams stoutly denies these charges of fraud, and insists that in each instance he explained to the proposed subscriber the outline of procedure by which the creamery could be built and operated, and the possible and probable results that could be obtained by its successful operation. The subscribers were all farmers living separately and in different sections of the county; and in each instance Williams, who was a stranger in the community, was introduced either by Dr. Smock or by Clark, who corroborated Williams as to what took place upon each occasion. It would, indeed, be a singular and an unusual state of case where nine intelligent farmers, and men of property, could, on separate and distinct occasions, be misled into signing a printed contract without reading it, and under the same general misapprehension as to its contents and effect. The contract was simple in its provisions, and was not difficult to understand. Moreover, forty-six of the fifty-five original subscribers have made no complaint; on the contrary, they have not only paid their subscriptions, but have joined in a united effort to make the projected creamery a successful business venture.

Furthermore, at the organization meeting held at the depot in St. Marys, the subscribers appointed an investigating committee of three members, as provided by the contract, for the purpose of investigating other creameries and reporting thereon, in order to determine whether or not the contract should become binding. That committee consisted of W. M. Spalding, J. F. Peterson and W. A. Walker. The committee visited similar creameries located at Charlestown and at Otisco in Indiana, and at Bloomfield, Taylorsville and Shelbyville in Kentucky. As a result of its investigation the committee made the following report which is to be read in connection with the paragraph of the contract first above quoted, viz.:

"We find the above representations corroborated by our investigations.

"7-22, '08.

"W. M. SPALDING,
"J. F. PETERSON,
"W. A. WALKER."

Upon the faith of this finding of fact by the committee of the subscribers, the contract became effective and the creamery was built and accepted.

When we analyze the grounds of fraud relied upon by the subscribers for a rescission of their contract, we find they consist of three, or possibly four, elements; (1) a concealment by Williams of the nature of the contract; (2) his verbal guaranty that their stock would net the subscribers six per cent annually; (3) that Williams falsely represented that Rogers, the president of the bank, had or would take stock in the creamery; and (4) that they did not read the contract.

What amount of evidence will be necessary to overturn a contract for fraud has been well stated in Western Mfg. Co. v. Cotton, 126 Ky., 752, as follows:

"But, when it is said that a written contract may be impeached for fraud or mistake, it does not follow that it can or ought to be overturned lightly. The presumption is in favor of the writing. He who attacks it must bear the burden; and the rule is that the fraud or mistake must be established as clearly existing by substantial and satisfactory proof.

"The error is sometimes made of supposing that a mere allegation of fraud or mistake opens the written contract, and its merits will then depend upon the preponderance of the evidence. But it should always be borne in mind that written documents, admittedly signed by the parties (and) entered into in solemn form and with apparent deliberation—for such the writing imports—must stand, unless by strong evidence of a convincing nature the judicial mind is convinced that it was obtained by fraud, or fails because of the mutual mistake of the parties to state the true agreement."

And, in Livermore v. Middlesborough Town Lands Co., 106 Ky., 163, we further said:

"To establish actionable fraud, or fraud against which equity will relieve—and, as we have seen, the same rule applies in Kentucky to both classes of cases—it

must appear that the misrepresentation was of a matter of material fact (as distinguished from opinion), at the time, or previously existing (and not a mere promise for the future); must be relied upon by the person whose action is intended to be influenced; and must be made with knowledge of its falsity, or under circumstances which did not justify a belief in its truth. This is the doctrine deducible from the Kentucky decisions. There are some modifications of this doctrine, but they are chiefly by way of substitution of an equivalent for some one of the essentials necessary to constitute fraudulent misrepresentations; as in the cases where it is held that a fraudulent concealment of a material matter of fact is the equivalent of an actual misrepresentation, and the cases in which a statement made as of personal knowledge, but without knowledge, was held to be equivalent to a statement whose falsity was known.''

Applying these rules of law to the facts of this case, what do we find?

The concealment of Williams of the nature of the contract from the subscribers, and their failure to read it, may properly be considered as a single ground, since the alleged failure to read the contract is evidently connected with and based upon the concealment of the nature of the contract upon the part of Williams. The evidence by no means sustains this ground; but, if there were any evidence to show that the contract was obtained by fraud or misrepresentation, the subscribers took part in the organization meeting when the contract was publicly read in full, and no substantial objection or criticism was made either to its execution or its contents. Up to that time the contract was not binding upon any one; it was only after it had been read publicly in the organization meeting, and after the committee upon investigation had reported favorably upon the work of the other creameries, which was a condition precedent, that the contract became binding. If the contract had been signed under a misapprehension or without reading it, certainly fair dealing required that objection should have been made at the first opportunity; and clearly every one knew of the full purpose and effect of the contract at the organization meeting, even though his signature may have been improperly obtained, or he may not have read the contract when he signed it. The two remaining grounds, that Williams guaranteed that their

stock would net the subscribers six per cent annually, and that he falsely stated that Rogers would take stock in the creamery, are of no more substantial character. Williams was a solicitor of subscriptions, and had no real or apparent authority to bind either the appellant or the proposed creamery corporation as to the future profits of the latter. The creamery company was to be organized and owned by the subscribers, and it is not claimed that the building company was to have any interest in or control over its management. Furthermore, it has not been shown that Rogers did not promise to take stock in the creamery company; it is only shown that he finally declined to take it, the testimony leaving the impression that he had changed his mind in reaching that conclusion.

Applying the rules of law above announced to the facts of these cases, we have no hesitation in saying that the subscribers have wholly failed to sustain the burden which the law places upon them.

The judgment is affirmed upon the cross appeals of Peterson, Walker and Mattingly, and reversed upon the original appeal of The Chicago Building & Manufacturing Company, and remanded for further proceedings consistent with this opinion.