### Crawford & Gatlin v. M. Livingston & Company.

### B. W. Potts & Company v. M. Livingston & Company.

(Decided March 20, 1913.)

Appeals from McCracken Circuit Court.

Contracts—Written Contract—Parol Evidence Not Admissible to Alter or Modify.—Where the parties to a written contract are dealing at arms' length, and there is no relation of trust or confidence between them, parol evidence to vary or modify the terms of the contract will not be admitted. All prior and contemporaneous parol representations will be treated as merged into the written contract, which will be treated as speaking the intention of the parties to it and expressing their mutual understanding of what was agreed upon, and all that was said before will be put aside.

JOS. R. GROGAN, D. G. PARKS for appellants.

WHEELER & HUGHES for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming judgments of the lower court on both appeals.

These two cases were heard together in the lower court and will be disposed of in one opinion.

In March, 1910, the appellants, who are retail merchants, purchased from the appellees, who are wholesale merchants, a quantity of Economy Fruit Jars. The sales were made through an agent of the appellees, and the contract of purchase was in writing. This writing

among other things, contained the following provisions in large type:

"Terms regular; no jars consigned; no exclusive agencies given; under no circumstances are sales guaranteed; this order is not subject to countermand; no promise or agreement valid unless specified on this order; no salesman authorized to alter terms or conditions printed on this contract."

The contract did not make any representations as to the quality or usefulness of the jars or describe the manner in which fruit, vegetables and other things could be preserved. It merely contained a description of the mechanical features of the jars and gave the price at which they were sold and the date when they were to be shipped.

The appellants failing to pay for the jars at the time specified in the contract, the appellees brought suit against them to recover the amount due. The petitions did not set out the written contract, but merely averred in the ordinary way the facts relating to the contract of sale and purchase and the amount due.

For answer to these suits, the appellants averred, "That the sale of the goods and acceptance of them were procured by plaintiffs to be made to the defendants through the false and fraudulent statements and representations of their general traveling salesman, Mr. James, who sold the goods to the defendants for the plaintiffs with full authority from them to make the sale to these defendants upon the special terms agreed on in the sale, and defendants relied on such statements in purchasing the goods, and but for which they would not have made the purchase.  *  *  *  And the traveling agent and salesman of plaintiff falsely and fraudulently stated and represented to these defendants in negotiating the sale that such jars were of the best and latest manufacture and designs for the preservation of fruits and vegetables, and that they would successfully keep or preserve both fruits and vegetables for use in canning purposes; but these statements and representations were false and fraudulent, and known to be so by such agent when he made them, and defendants say that the jars and sealing process under which they were used were worthless and of no value, and were not and did not and could not preserve the fruits or vegetables canned in them.  *  *  *  Defendants say so soon as they discov-

ered the fraud of plaintiffs through their agent, they carefully prepared all of the jars for shipment and re-shipped them to plaintiffs, but plaintiffs wrongfully refused to accept a return of such jars or a rescission of the contract of sale, and still wrongfully refused to accept them. They further say that there were a few jars defendants could not procure to return, and for these they mailed plaintiffs a check, but plaintiffs wrongfully refused to accept such check.''

The replies to these answers, after controverting the affirmative matter, set out the written contract between the parties and the conditions therein heretofore quoted, and averred, ''that the defendants read, or could have read such contract before signing the same, and knew, or could have known, its provisions, and well understood at the time, or could have understood by the reading of the contract which they signed, that the agent or salesman selling said goods was not authorized to make or agree to any terms other than those stated in the contract agreed upon and signed by the parties to said sale, and plaintiffs plead and rely upon the written contract referred to as an estoppel against any claim or representation alleged to have been made by any salesman or agent of the plaintiffs.''

After other pleadings and motions had been made, the cases went to trial before a jury, and the evidence on behalf of the appellants showed that the agent who sold these jars made at the time of the sale a great many extravagant, reckless and unfounded assertions and representations concerning the superior quality of these jars and the great advantage in using them over other jars made for like purposes, and that the purchasers relied on the representations made by the agent and were induced thereby to purchase the jars. It was further shown that the jars did not at all fulfill or come up to the representations made by this agent, and that they were not superior to or as good as like jars of other manufacture. A number of witnesses were introduced who testified that they bought these jars from the appellants and found them unsatisfactory, if not worthless.

On the other hand, the evidence on behalf of appellees showed that the manufacturer of the jars sent out with each purchase a number of circulars describing the method of using these jars and the manner in which different kinds of fruits and vegetables should be preserved, and

that these circulars were intended to be and were given to purchasers by the retail merchants selling the jars, and that when these directions were observed the jars gave entire satisfaction, and that the jars had been on the market for several years and were in general use.

The evidence further shows that the jars purchased were delivered to the appellants some time in April or May, 1910, and that in June, 1910, the appellants wrote to the Pickrell-Craig Co., who were interested in the sale of the jars with appellees, the following letter:

"We bought twenty-five gross Economy Jars from your salesman. Now, if there is an honorable way to keep from taking these, we would like very much to do so. The fruit is gone and we will not need so many for other things, and we have neither the money nor place to carry so many over. Now understand, we are willing to do the right thing, but it is no money to have so many out here for either one of us in the long-run. Will take some of them this time and some next."

It also appears that in August, 1910, they made a payment on the purchase price of the jars, and about September first they notified the appellees that they would not pay for any of the jars that had not been sold and offered to return the ones on hand and pay for those that had been sold.

Appellants also testified that they signed the written contract and read and understood it before signing it. Upon the conclusion of all the evidence, the trial judge directed the jury to return a verdict against appellants for the amount due on the account, and judgment was entered accordingly. The only substantial error assigned by appellants relates to this ruling of the court.

It is evident that the trial judge took the case from the jury because he did not believe the parol evidence in respect to the representations made by the agent was sufficient to overcome the written contract entered into between the parties, and in this view we concur. Appellants were intelligent, experienced merchants, familiar with the exaggerated praise salesmen are in the habit of indulging in efforts to sell their wares. There was no relation of confidence or trust or any reason why they should have relied on the extravagant talk of the salesman, who was a stranger to them, especially when the jars, which were simple household articles in common

use, were before them while the agent was describing their virtues.

It is, however, probable, and for the purpose of the case we assume, that this salesman made all the representations appellants say he did, and that they relied on them, although many of the assertions made by him were false and on their face apparently absurd. But whatever representations the salesman made, it is conceded that following this talk they read and understood and signed a writing that set out the entire contract of purchase and sale. There was nothing obscure or complicated about this writing. It was short, simple and easily understood, and they were advised by it that no guarantee accompanied the sale, that no promise or agreement was valid unless specified in the order, and that the salesman had no authority to alter the terms or conditions of the contract.

If, under the circumstances of this case, a written contract could be set at naught, there would be little use in parties putting their engagements in writing, and written contracts would be no more stable than verbal ones. It is of the utmost importance in the transaction of business affairs that written contracts should be upheld in the absence of strong and convincing evidence that they were procured by fraud or mistake. The very purpose of putting business engagements in writing is to insure the certainty of the contract against the temptation to avoid it by one of the parties who may subsequently conclude that its terms are not as satisfactory to him as he expected they would be when the contract was entered into. Each of the parties to a written contract has the right to assume that the contract will be observed as written, and on the faith of it may enter into other business arrangements that often involve the affairs of other people, and so the interests of many may be directly affected by the contract of a few, and this frequently occurring business condition increases the importance of requiring parties to abide by what they have mutually agreed to do.

It is, too, a matter of common knowledge that memory, especially when biased by interest, is often at fault in remembering the exact details or terms of a contract; and it is also true that when men meet for the purpose of entering into a contract a great many things are said that are liable to be misinterpreted and misunderstood,

and this leads not infrequently to differences of opinion as to the meaning and effect of the contract, and is the source of innumerable law suits. But when they have talked the matter over, and each has had his say, and they put into a few words in writing the real contract they have entered into, it is reasonable to presume, and the law does so, that this writing speaks the intention of the parties to it and expresses their mutual understanding of what was agreed upon, and all that was said before is put aside. J. I. Case Threshing Machine Co. v. Mattingly, 142 Ky., 581; Provident Saving Life Assurance Society of New York v. Shearer, 151 Ky., 298. As aptly said in Western Manufacturing Co. v. Cotton & Long, 126 Ky., 749:

"If the paper itself is plain in its statements, easily understandable, and bears on its face no evidence of the alleged fraud, it operates by law to merge all that was spoken before, leading up to its execution. All that was said then, and which is not incorporated into the document, must be regarded as abandoned or modified by the terms finally written down and signed. Such is the very purpose of written instruments. It is to make certain that which may have been indefinite, or about which a dispute might arise, depending for its settlement upon fickle memories or interested testimony. As the paper speaks for itself, cannot be misunderstood, and forgets not, the law looks with marked favor upon written documents as evidence, placing them in the highest category. All this would be undone if either party were still at liberty to refute the writing by his own mere word, however trustworthy he may be. No rule could more completely unsettle the law of evidence, built up so painstakingly and wisely by generations of jurists and legislators."

There are of course many cases in which written contracts have been modified or declared of no effect because they were procured by fraud and misrepresentation shown to exist by parol evidence, but these cases are an exception to the general rule excluding parol evidence intended to alter a written contract, and will be found to rest on exceptional circumstances that established in a satisfactory manner that the party assailing the writing was not dealing at arms' length with his adversary or that some relation of confidence or trust existed. But we find no such condition in this record or

anything that would take it out of the rule we have laid down as applicable.

Some other matters of minor importance are mentioned by counsel, but what we have said disposes of the real question in the case, and the judgment on each appeal is affirmed.