## Teater v. Teater.

### (Decided May 21, 1914.)

### Appeal from Garrard Circuit Court.

1. Contracts—Cancellation of for Fraud or Mistake—Burden of Proof.—When a party undertakes to set aside a written contract the evidence in his behalf must be very convincing, and the fraud or mistake established by substantial and satisfactory proof.

2. Contracts—Fraud—Evidence Sufficient to Show.—Where the owner of a life estate, who had been asking $1,200 for it, sold and conveyed it to her step-son for $300, the inadequacy of the price, the relationship between the parties, and other circumstances connected with the transaction showed that she was entitled to a cancellation of the contract.

LEWIS L. WALKER for appellant.

R. H. TOMLINSON for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

On August 31, 1912, the appellee, Mattie Teater, conveyed to the appellant, Henry Teater, her life estate in 21 acres of land that had been set apart to her as dower in the division of her husband's estate. The consideration recited in the deed was three hundred dollars, payable in equal instalments of $75 each, due respectively on January 1, 1914, 1915, 1916 and 1917, bearing interest from January 1, 1913.

On September 18, 1912, the appellee brought this suit against the appellant for a cancellation of the deed, upon the ground that it had been procured by fraud. After the issues were made up and the evidence taken, the case was submitted for hearing, and a judgment rendered cancelling the deed and the four purchase-money notes. From this judgment the defendant in the suit below, Henry Teater, prosecutes this appeal and asks that the judgment be reversed because the evidence introduced by the appellee was not sufficient to justify the court in cancelling the contract.

It appears from the evidence that the appellee is the step-mother of appellant; that she married his father in 1881 when the appellant was quite a small boy, and lived with him until his death in 1885. After his death his land was divided and the tract here in controversy set apart as her dower. Soon after this she moved to another part of the county some distance from the land, and has since resided there, being at the time the deed was made about 59 years old.

It is further shown that she had little or no experience in business affairs and that her dower was looked after by her brother, who rented it for a number of years for a hundred dollars a year and for several years previous to 1912 at eighty dollars a year. It is further shown that the appellant lived close by this piece of land and for some time before the deed was executed had been anxious to purchase it, as he and his two brothers owned the land subject to the life estate of appellee.

The matter of purchasing the land had been discussed perhaps more than once between the appellant and John Ison, the brother of appellee, who had charge of the place, but they seem not to have been able to agree on a price for appellee's life estate. The evidence is conflicting as to the value of the fee in the land, some of the witnesses placing it as high as fifteen hundred dollars and others as low as seven hundred dollars. Other land in that neighborhood was selling at high prices, but this tract had been very much neglected, and although perhaps naturally good land, it had depreciated very much in value on account of the manner in which it had been worked and the little attention that was given to the care of the buildings, the fences, and the place generally. But notwithstanding the run-down condition of the place,

the appellee was getting eighty dollars a year rent for it and her expectation of life was about fourteen years. So that if she had lived her expected period and had gotten an average rental of $75 a year, she would have received from the land during that time about $1,000. Or if it should be estimated that after the payment of taxes, repairs and other incidental expenses, the net income would only be $50 a year, she would have received in the fourteen years as income from the land $700.

If, however, the contract should be sustained, we would have the appellee selling her interest for $300 in four yearly payments of $75 each, or not more than she could realize as rent from the land for four years, and at the end of four years she would not have any income from it or any other source, as it appears that this is the only property that she owns. It will, therefore, be at once seen that the trade was a bad one for the appellee looking at the matter from any standpoint.

It might also be observed that the value of the fee in this land is not entitled to controlling importance. It is not so much what the fee was worth, but what income the appellee could derive from the land that fixed its value as to her. If the fee had only been worth, as some of the witnesses said, $700, this did not fix the value of the place to her, as the rent derived was not estimated at all on the value of the fee but on what the land was worth to her.

Under the law applicable to the transaction, the burden of proof was on the appellee to show that the contract was procured by fraud or overreaching of some kind, and we have written in a number of cases that when a party undertakes to set aside a written contract, the evidence in his behalf must be very convincing and the fraud or mistake established by substantial and satisfactory proof; Chicago Building & Manufacturing Company v. Beaven, 149 Ky., 267; Crawford & Gatlin v. Livingston, 153 Ky., 58. And we think the evidence sufficient to bring the case for appellee within the scope of this rule.

It further appears from the evidence that a short time before the deed was written the appellant invited the appellee to come to his house and spend a few days, and that his wife or one of his children went after her. That on the same day that she arrived at his house appellant, who was very anxious to get her interest, brought up

the subject of purchasing it, although she did not know that any efforts would be made to buy her interest on this visit.

She testified, in substance, that soon after she arrived at his home the appellant commenced talking to her about selling the place, but that she had not thought much about it, as her brother had always attended to it, but had a notion that her interest was worth about $1,200. That the next morning the appellant went to Lancaster and came back with a deed and told her that the deed recited that he was paying her $1,200 for the place. That she did not read the deed or hear it read. That she had implicit confidence in the appellant and believed that he would not try to deceive her, and that the deed did in fact recite that he was paying her for her interest $1,200. That she did not read or hear read the notes for the purchase-money, and that the appellant put them in an envelope and sealed them up and gave them to her to keep. That at the request of appellant she went with him the same day to a notary to acknowledge the deed, and that the notary asked her if she wanted it read, and she said no, that she was satisfied as she was getting $1,200 for the place; and that the notary did not read the deed to her. That a week or so afterwards she heard it rumored that the appellant said he was to pay her only $300 for it, and when she heard these rumors she went to see a lawyer and then for the first time discovered that the consideration recited in the deed was only $300, and at once brought this suit.

The notary said that on the morning the deed was signed the appellant came to his house and asked him if he could go to his, appellant's, house and take an acknowledgment to a deed, and that he could not do it on account of some sickness in his family; whereupon appellant told him that he would bring the appellee over to his house. That the appellant and appellee came to his house in the afternoon, and he asked the appellee if she wanted the deed read, and she said she did not, and that he did not read the deed as the appellant said it was all right. He further said: "I asked him how many acres in the place and I asked him what the place cost, and he said '$1,200.' Q. At the time Henry mentioned paying $1,200 for the land, what was said about that? A. Nothing, only he said he gave $1,200. I asked him what the place cost and he said '$1,200.'"

The brother of appellee, who had been attending to the place for her, said that appellant had been trying to buy the place and that he wanted $1,250 for it.

Other witnesses testified to statements made by the appellant at different times tending to show his desire to buy the land and different statements he made as to what it had cost him.

The appellant's evidence was, in substance, that on the occasion of the visit the subject of his purchasing her interest, as well as that of his brothers, was brought up by the appellee, and that he told her he was going to buy the interest of his two brothers at $300 apiece and would buy her interest if he could get it at $300, and she told him he could have it at that sum, and, after further talk, the payments were agreed on and it was understood that he was to have the deed written the next morning and get her acknowledgment to it. That when he came back with the deed on the next day, the matter was again discussed and it was fully understood by the appellee that the purchase price was $300, nothing being said about paying her $1,200 for her interest or that the deed recited a consideration of $1,200. He further testified that he purchased the interest of his two brothers in the land for six hundred dollars, and that if any statements were made about the land costing him $1,200, these statements were made in estimating his own interest at $300, the interest of his two brothers at $600, and that of the appellee at $300, making the total cost to him $1,200.

Other witnesses in his behalf, who were present at his house, testified that the appellee thoroughly understood that she was to be paid $300 for her interest and that she had sold it to appellant for that sum.

Without relating more of the evidence, it seems sufficient to say that when all the facts and circumstances developed in the testimony are considered, there is sufficient to show in a very satisfactory way that the appellee did not know or understand that she was only getting $300 for her interest, and the circumstances surrounding the execution of the deed conduce strongly to show that the parties were not dealing at arms' length in making this contract. There was a good deal of haste about it on the part of the appellant and a seeming purpose to take advantage of the presence of appellee at his house and the absence of her brother who

attended to all of her business. The relations between the parties coupled with the confidence reposed by appellee in the integrity of her stepson put on him the duty of dealing fairly with her.

Then, too, the great inadequacy of the price, considering the income derived by appellee from the land, taken in connection with the price that had been previously placed on her interest when appellant attempted to purchase it, are convincing circumstances that appellee must have been, whether intentionally or not, deceived into the belief that she was getting $1,200; or, taking the view most favorable to appellant, she was misled, by his statement that the fee in the land would cost him $1,200, into the belief that the $1,200 mentioned was to be the compensation for her interest.

It is inconceivable that the appellee would, without consulting her brother, understandingly have taken $300, payable in annual installments of $75 each, when she was getting as rent $80 a year for the place and had a reasonable life expectancy of several years. The prompt action that she took upon discovering that she was only to get $300 is another circumstance that tends to support her view of the transaction. It may be that appellant understood that he was only paying her $300, but we think it certain that the appellee did not so understand it; and looking at the matter from any standpoint it seems quite clear that the parties to this contract did not understand each other, and that there was no meeting of minds.

Upon the whole case, we have reached the conclusion, as did the chancellor, that the ends of justice and right will be better satisfied by cancelling the contract than they would be to enforce it, and that all the facts and circumstances shown in the record, many of which we have not related, were entirely sufficient to authorize the judgment under the rule that the burden of proof is on the complaining party in cases like this, and relief will not be granted unless there is satisfactory and convincing evidence, direct or circumstantial, that the contract should be set aside.

Judgment is affirmed.