ILLINOIS FUEL COMPANY v. MOBILE & OHIO RAILROAD COMPANY, Appellant.

Division One, April 11, 1928.

900

*Carl Fox* for appellant; *R. C. Beckett* and *R. P. & C. B. Williams* of counsel.

904

*Nagel & Kirby* for respondent.

*Wilfley, Williams, McIntyre & Nelson* and *Carl Fox* for appellant in reply; *R. C. Beckett* and *R. P. & C. B. Williams* of counsel.

ATWOOD, J.—This is an appeal from a judgment for $51,811.49 against the Mobile & Ohio Railroad Company in an action on the following written contract for the purchase of coal, identified in the agreed statement of facts contained in the abstract of the record as Exhibit C-4:

"This Agreement, made and entered into this the 1st day of July, 1920, between the Mobile & Ohio Railroad Company and the Southern Railway Company in Mississippi, hereinafter called the Railroad Companies, and Illinois Fuel Company, of Sparta, Illinois, hereinafter called the Coal Company, Witnesseth:

"That, in consideration of the mutual promises and other valuable considerations, the Railroad Companies hereby purchase from the Mining Company and agree to receive and pay for, and the Mining Company hereby sells and agrees to ship from its Illinois Mines located at Sparta, the quantity and grade of coal hereinafter stated, upon the terms and subject to the conditions stated below, to-wit:

Period: July 1, 1920, to July 1, 1921, except as hereinafter provided.

Quantity: 50,000 net tons of 2000 pounds.

Shipments: Approximately equal daily quantities.

Quality: Straight run of mines, reasonably free from all impurities such as sulphur, slate, bone, fire clay, and other non-combustible matter; the Railroad Companies at their option to take such lump coal as they may require.

Weights: Mine weights and mine prices shall govern all settlements; but in the event the coal is not weighed at the time, then the first railroad weight shall govern.

Prices: Mines at Sparta, Illinois.
Mine-run coal $2.45 per net ton of 2000 pounds.
It is distinctly understood that the prices named herein are based on existing rates of pay for all mine labor and these prices will be subject to readjustment in event existing rates of pay are changed.

Terms and   The Railroad Companies agree to remit in full on or be-
Conditions:   fore the twenty-fifth day of each month for all coal shipped during the preceding month. If credit of the Railroad Companies shall at any time become impaired or unsatisfactory, the Mining Company reserves the right to require payment in advance before making further shipments. The Mining Company will assume no responsibility for transportation or charges therefor.

"This agreement shall be subject to labor troubles, floods, accidents, delays, shortage of cars, contingencies of transportation, or other causes beyond the control of the party affected, neither party to be liable for failure to perform on account of these causes. Should production of available tonnage of coal herein contracted for, due to above causes, prevent the Mining Company from meeting all of its obligations, the Railroad Companies agree to accept as complying with agreement during such period, such proportion of the available coal as the Railroad Companies' orders (under contract herein), bear to such total obligations to the Mining Company. The above conditions not to be applicable to, nor entitle the Railroad Companies to cancel shipments after same have left mine or mines.

"Non-compliance of the Railroad Companies with any of the terms of this contract will entitle the Mining Company, at its option, at any time, to cancel this contract, irrespective of failure to cancel for prior non-compliance.

"In Witness Whereof, the parties hereto have executed this agreement in duplicate on this the 1st day of July, 1920.

Attest:       MOBILE & OHIO RAILROAD COMPANY
(Signed) P. E. KELLER       By (Signed) W. J. DIEHL,
                                    Purchasing Agent.

Attest: SOUTHERN RAILWAY COMPANY IN MISSISSIPPI
(Signed) P. E. KELLER.       By (Signed) W. J. DIEHL,
                                    Purchasing Agent.
                    ILLINOIS FUEL COMPANY
                  By (Signed) W. V. STOCKTON
                            General Manager.

Attest:
(Signed) J. C. NEWMAN
      Secretary
(Illinois Fuel Company Seal)"

Plaintiff's petition alleged that it was an Illinois corporation engaged in the business of mining and selling coal; that defendant Mobile & Ohio Railroad Company was an Alabama corporation engaged in the business of operating a steam railroad doing business in

the State of Missouri with offices in the city of St. Louis, Missouri; that the Southern Railway Company in Mississippi was a Mississippi corporation engaged in operating a steam railroad, and that its charter was so amended on or about November 1, 1920, that its name was changed to Columbus & Greenville Railroad Company. After identifying "Exhibit A" attached to said petition as a true copy of said written contract and pleading the contents thereof, said petition further alleged that plaintiff had complied with all the terms and conditions of said written contract, and in pursuance thereof "between July 1, 1920, and July 1, 1921, plaintiff sold and delivered to the railroads and said railroads received and accepted 3,268.30 tons of coal at $2.45 per ton, and 45,465.45 tons of coal at $2.62 per ton, and thereupon and thereby said railroads, and each of them, became indebted to plaintiff under said contract in the sum of $127,126.77; . . . that said railroads under said contract paid $68,954.02 on account of said indebtedness, but, although payment has been often requested, defendant has failed and refused to pay the balance due, or any part thereof. That said balance, being the sum of $58,172.75, with interest, still remains due from defendant to plaintiff and is unpaid."

For the amount last above named judgment was prayed, together with interest and costs. In this connection it should be observed that the parties subsequently stipulated and agreed that the amount due the Illinois Fuel Company for coal shipped under this contract was $44,422.86, and it was for this amount together with interest accrued thereon that the trial court rendered judgment in favor of plaintiff in the sum of $51,811.49.

Defendant went to trial on its second amended answer, paragraph I of which denied "each and every allegation in said petition contained." In paragraph II defendant's incorporation was alleged, and it was further pleaded that "none of the coal mentioned in plaintiff's petition was delivered or used by this defendant and the Columbus & Greenville Railroad Company jointly," and that it was *ultra vires* said railroad companies "to assume the asserted obligation, by joint contract or otherwise," or for either company to pay for coal shipped to and used by the other, certain constitutional and statutory provisions of the States of Alabama and Mississippi and judicial decisions of the State of Alabama being specifically pleaded and proved in support thereof. In paragraph III of said answer it was further alleged that "the said W. J. Diehl, who signed the alleged contract of sale on behalf of this defendant, was wholly without any authority given to him or conferred upon him by this defendant, either actual or apparent, to make a joint contract of purchase and sale, or a contract obligating and binding this defendant to pay for coal sold and delivered by plaintiff to the said Columbus &

Greenville Railroad Company, or to become guarantor or surety for coal so sold and delivered.'' In paragraph IV of said answer it was further pleaded that ''the alleged contract was made and executed and to be performed in the State of Illinois, and was at all times performed in the State of Illinois,'' and that ''under its said charter of incorporation and under the common law at all times in force in the said State of Illinois, as interpreted and declared by the decisions of the courts of last resort in said state, the said defendant is and at all times has been without power or authority to make a joint contract of purchase or sale, such as is described in plaintiff's petition, and is, and at all times has been, without power or authority to make a contract of guaranty, or to obligate or appoint itself to pay for coal sold and delivered to the Columbus & Greenville Railroad Company,'' certain judicial decisions being pleaded and proved in support thereof from the State of Illinois.

Plaintiff's amended reply admitted defendant's incorporation, but denied each and every other allegation in paragraph II of defendant's second amended answer. Further replying plaintiff alleged that defendant and the Southern Railway Company in Mississippi were connecting carriers and that under Section 3497 of the Alabama Code of 1907, which was specifically pleaded, defendant had power to make the contract sued on. In reply to paragraph III of defendant's second amended answer plaintiff denied each and every allegation therein contained, and further replying set up certain facts and alleged that by reason thereof defendant was estopped to deny that W. J. Diehl ''had authority to make the joint and several contract sued on.'' Replying to paragraph IV of defendant's second amended answer plaintiff denied each and every allegation therein contained, and further replying set up certain facts and alleged that by reason thereof defendant ''cannot set up the defense of *ultra vires* and is estopped to deny that it is liable on the joint and several contract sued on.''

Defendant filed demurrer to certain parts of plaintiff's amended reply, which was overruled. Thereafter defendant filed its motion to strike out certain parts of plaintiff's amended reply, which motion to strike out was overruled.

The case was submitted to the court, without the intervention of a jury, upon the issues thus made and upon an agreed statement of facts and stipulation with exhibits attached, objections being noted with reference thereto. Before the decision of the case defendant presented in writing and requested the court to give thirty-one declarations of law. The trial court gave declarations numbered 5, 17 and 18, and refused to give the remainder. Defendant filed its exceptions to the rulings of the court in the trial, and after adverse judgment as aforesaid filed its motions for a new trial and in arrest

of judgment, which were overruled, and thereafter plaintiff. perfected this appeal.

Counsel for appellant in their reply brief say there are but two possible major propositions of law in this case, and briefly state what they contend to be the real questions in the case as follows:

"First. Did the M. & O. Railroad Company agree to pay plaintiff for the coal which plaintiff delivered to and which was used solely by the Southern Railway Company in Mississippi?

"Second. If it is held that the defendant did so agree, is the obligation void by reason of the rule of *ultra vires?*"

While it may be assumed that the above fairly indicates appellant's ultimate position, yet the issues joined are not as easily determinable as such a terse statement might indicate. We shall therefore endeavor to consider also, in accordance with our own idea of sequence, the numerous points raised and grouped in appellant's first brief, and in such connection will make appropriate reference to the pertinent stipulated facts, exhibits and other matters in the record.

It is apparently conceded that the paper writing above set forth was duly signed by the purported parties and constituted a contract between them. The chief matters in dispute are the nature of the contract and the force and effect to be given its terms. Opposing counsel make conflicting claims as to the place of contracting, or the place in which the act was done which made the contract binding, and of the state laws which should govern. The question whether the law of any state has imposed such an obligation as the one here alleged is a question of the law of contracts and therefore involves the determination of the place of contracting, since the law of that State is the law which imposes the obligation alleged if any such is imposed, absent proof of a contrary intention of the parties. Hence, the first matter to be determined is the place of contracting, and this the court of the forum decides according to its own conception of the conflict of laws. The guiding principle is thus stated in Am. L. Inst. Restatement, Conflict of Laws (Tent.), section 333:

"A contract is made in the State where the last act toward the completion of the contract is done by a party to the contract, or by an agent who makes a contract for a principal."

This statement is well supported in 13 Corpus Juris, 580; Wharton on the Conflict of Laws (3 Ed.) page 888; 5 Ruling Case Law, 935; Peak v. International Harvester Co., 194 Mo. App. l. c. 131; Lukens v. Ins. Co., 269 Mo. l. c. 581; Liebing v. Ins. Co., 276 Mo. l. c. 134; and numerous other authorities. Its accuracy is not challenged, but the views of opposing counsel are far apart as to which was "the last act toward the completion of the contract," and, consequently, they differ as to the "place of contracting." Counsel for appellant in-

sist that it was the act of the mining company, done at Sparta, Illinois, in mailing its signed contract to the agent for the railroad companies at St. Louis, Missouri, and, therefore, the place of contracting was Sparta, Illinois. Counsel for respondent say that it was the act of the agent for the railroad companies, done at St. Louis, Missouri, in mailing the contract to the mining company at Sparta, Illinois, after he had signed same on behalf of his principals, and, therefore, the place of contracting was St. Louis, Missouri.

According to the agreed statement of facts W. J. Diehl, who signed the contract on behalf of the railroad companies, "was on the date of the contract involved in this suit purchasing agent of each of said railroad companies." Also, prior to April, 1920, "the Mobile & Ohio Railroad Company and the Southern Railway Company in Mississippi maintained joint offices for their traffic departments in St. Louis, Missouri, and maintained joint offices for all other departments at Mobile, Alabama. In April, 1920, the offices of those departments at Mobile, except the accounting departments and treasury departments, were moved to St. Louis, and thereafter and on July 1, 1920, both of said railroads maintained offices in the same suite of rooms in St. Louis, Missouri, except the accounting departments and treasury departments, which remained at Mobile and occupied joint offices, as above stated." Also, prior to July 1, 1920, "E. E. Norris had been elected vice-president in charge of operations of the Mobile & Ohio Railroad Company by its board of directors, and had been elected vice-president in charge of operations of the Southern Railway Company in Mississippi by its board of directors, and the said E. E. Norris had authority to purchase supplies and make contracts and to direct the purchase of supplies and the making of contracts for each of said companies, and also had authority from each company to appoint a purchasing agent for such company. In the exercise of this authority he appointed as purchasing agent for each of said companies W. J. Diehl, who derived his authority from the said Norris. The said Norris knew of the making of the contract involved in this suit and had actual knowledge of the form and terms of said contract, as it was drawn by the said Diehl before the execution thereof." Also, "after negotiations with the plaintiff, the said W. J. Diehl drafted the contract in question and mailed it unsigned from St. Louis, on June 29, 1920, to plaintiff in a letter of that date addressed to Mr. R. V. Stockton, general manager, Illinois Fuel Company, Sparta, Illinois, the original of which is attached hereto and marked 'Exhibit C-1.' The said Stockton signed the said contract for the Illinois Fuel Company at Sparta, Illinois, and on July 2nd mailed it to the said Diehl at St. Louis, enclosed with a letter of that date, the original of which is attached hereto, marked 'Exhibit C-2.' Upon receipt of the said contract the said Diehl signed

the name of each of the railroad companies, by himself, as purchasing agent thereof, at St. Louis, Missouri, and mailed one copy thereof, enclosed with a letter of that date addressed to the said Stockton, General Manager, Illinois Fuel Company, at Sparta, Illinois, the original of which is attached hereto, marked 'Exhibit C-3.' '' The three exhibits above referred to are as follows:

## EXHIBIT C-1.

Mobile and Ohio Railroad Company
Southern Railway Company
in Mississippi.

W. J. Diehl,
Purchasing Agent
Saint Louis, Mo.,

June 29, 1920
File 920

Mr. R. V. Stockton, Gen'l. Mgr.
Illinois Fuel Co.,
Sparta, Ill.
Dear Sir:
Yours of the 14th inst., quoting on 200 tons mine run coal daily at price of $2.45 per net ton f. o. b. cars, mine No. 4, Sparta, Ill. Also subsequent conference at St. Louis upon the subject.

I am attaching in duplicate contract covering a total of 50,000 net tons of 2000 pounds, to be delivered daily in approximately equal quantities, from July 1st, 1920, to July 1st, 1921, at $2.45 per net ton. Will you kindly have the contract properly executed on behalf of your company and return to me for final handling. I will return a copy to you properly executed.

I regret to inform you that after further consideration of the matter we found it impossible to increase the amount to 300 tons per day, as requested.

Yours truly,
W. J. DIEHL,
Purchasing Agent.

## EXHIBIT C-2.

The Illinois Fuel Company
Miners and Shippers
Coal and Coke

W. S. Ingraham, President.
W. V. Stockton, Treasurer.
J. C. Newman, Secretary.

Mines on Illinois
Southern and Mobile
& Ohio Railroads.
W. V. Stockton,
Gen. Mgr.
Sparta, Ill., July 2, 1920.

MR. W. J. DIEHL, Purchasing Agent,
Mobile & Ohio, Railroad Company,
St. Louis, Mo.
Dear Sir:
We are herewith returning to you duplicate contract properly executed for final handling, at which time, we note, you will return copy to us for our files.

Yours very truly,
W. V. STOCKTON,
General Manager.

EXHIBIT C-3.

Mobile and Ohio Railroad Company
Southern Railway Company
in Mississippi.
W. J. Diehl, Purchasing Agent.

Saint Louis, Mo., July 3, 1920.
File 920

MR. W. V. STOCKTON, General Manager,
Illinois Fuel Co.,
Sparta, Ill.
Dear Sir:
I am returning to you copy of contract properly executed for your files.

Yours truly,
W. J. DIEHL,
Purchasing Agent.

The record does not fully disclose what negotiations were had by the mining company and the agent for the railroad companies prior to said agent's action in drafting the form of contract and mailing it unsigned to the mining company. However, it is apparent that they had not reached the stage of a completed contract, for it seems from above Exhibit C-1 that neither the total amount of coal to be shipped, the dates between which shipments should be made, nor the amount of daily shipments had previously been agreed upon. This is not a case where an oral agreement was fully completed with intention that it should become binding on all parties thereto before reduced to writing, such as is discussed in Hudson v. Rodgers, 121 Mo. App. 168, l. c. 175, and other decisions cited by appellant. On the contrary, it seems clear that there was no previous complete agreement, and all parties intended that whatever their agreement might be it should not become binding until reduced to writing and signed. Diehl's letter indicates an intention on his part that the mining company should bind itself by signing and returning the written form of contract. Was it not clearly his intention also that his principals were to be bound only in the same way? Can it be that the contract was completed when the written form, prepared by agent Diehl and by him mailed unsigned to the mining company, was by the mining company signed at Sparta, Illinois, and there mailed back to Diehl? Appellant cites cases in support of the general rule that when a definite proposal addressed by one party to another is unconditionally accepted by the other a contract is then and there completed, and the place of acceptance is the place of contracting. [Allen v. Chouteau, 102 Mo. 309, l. c. 318; Horton v. Ins. Co., 151 Mo. 604, l. c. 619.] This rule contemplates a proposal made without any reservation and with the intention that the contract shall be complete upon acceptance of the proposal. Such were the facts considered in the cases cited by appellant, but such are not the facts presented in this case. The agent for the railroads sent the mining company a form of contract *unsigned* together with a letter

requesting that it be signed by the mining company and returned to him *"for final handling."* Evidently, he never intended that the contract should be completed and become effective when signed and mailed to him by the mining company at Sparta, Illinois, or he would have *signed* the contract in duplicate and mailed it with the request that it be likewise signed by the mining company and a duplicate original be mailed back to him. At any rate, if he intended that "the last act toward the completion of the contract" should be that of the mining company in mailing him the contract, after it had signed same, he should not and would not have said that it was to be returned to him *"for final handling."* Whatever else the use of these words may imply, the clear and unmistakable inference is that the agent of the railroads, and not the mining company, was to perform "the last act toward the completion of the contract." Whatever might have been his purpose in so doing he plainly reserved for himself the "final handling" of the contract, and the last act toward its completion was his own, performed in St. Louis, Missouri, in mailing a duplicate original of the contract to the mining company after he had signed both in behalf of his principals. This act made St. Louis, Missouri, the place of contracting. Counsel for appellant seek to avoid the conclusion we have thus reached by calling attention to the fact that the list of cars shipped under said contract, being Exhibit B attached to and filed with plaintiff's petition, shows that three cars of coal were shipped by plaintiff on the 2nd day of July, the date of the mining company's letter which was mailed with the contract to the agent for the railroads, although the contract was not signed on behalf of the railroad companies until July 3rd. From this they argue that all the parties to the contract understood that they had reached an agreement by which all were bound when the contract was by the mining company mailed back to Diehl on July 2nd, and that we should adopt the construction the parties themselves placed upon the mining company's final act. It does not appear that Mr. Diehl, the dual agent of the railroad companies, at that time placed any such construction on this act, or even knew on said date of July 2nd that the mining company signed the tract and furnished three cars of coal to the Mobile & Ohio Railroad Company, if, indeed, from the record it can be said that these cars of coal were delivered to and accepted by the railroad company on that day. On the contrary, it seems obvious that this agent never intended that the contract should be complete, final and binding upon his principals unless and until he had signed the written contract for them. It is of no consequence that immediately upon signing and mailing the contract plaintiff may have assumed to ship some of the coal, or even have treated the contract as completed before it was in fact complete. We adhere to our conclusion above stated,

that the place of contracting was in Missouri, and hold that the trial court properly refused defendant's declaration of law numbered 4.

Appellant also contends that the contract in question was several, and not joint and several as claimed by respondent. Appellant evidently concedes that this question is to be determined by the law of Missouri for no constitutional or statutory provisions or court decisions of any other state are pleaded or proved in support of this contention. Section 2155, Revised Statutes 1919, reads as follows:

"All contracts which, by the common law, are joint only, shall be construed to be joint and several."

Is this a joint contract by the common law? In Hill v. Combs, 92 Mo. App. 242, l. c. 252, the Kansas City Court of Appeals said:

"Under the common law, where two or more persons undertake the performance of an obligation, the presumption is that the undertaking was joint. Words of express joinder are not necessary for this purpose. Words of severance are required to produce a several responsibility, and in the absence of such words the undertaking is joint and not several. [Bliss on Code Plead., sec. 92; 1 Parsons on Contr. (6 Ed.) p. 11; Pomeroy on Rem. & Reml. Rights, p. 329.]"

In Townsend v. Roof, 210 Mo. App. 293, l. c. 298, the Springfield Court of Appeals thus defined a joint contract:

"A joint contract is one by which two or more promisors are jointly bound to fulfill its obligations and either of whom may be charged with the entire liability under the contract, or such contract may be one by which two or more obligors are given a joint right."

In Kron Livery & Undertaking Co. v. Weaver, 280 S. W. 54, l. c. 56, the St. Louis Court of Appeals thus applied the same measure:

"Besides, we think the statement sufficiently shows a joint liability on the part of the defendants. It shows that both defendants promised to pay for identically the same services; that both agreed to become primarily liable for such payment; that both undertook the performance of the same obligation. In the absence of a contrary showing, the undertaking is presumed to be joint."

The above excerpts harmonize with the generally accepted view, in proof whereof we quote (italics ours) from a few well-recognized authorities.

13 Corpus Juris, 577: "Whether the promises are several or joint, or joint and several, depends on the construction of the language used, and the intention of the parties *as manifested by the language used* must be followed by the court. If the contract made by several persons purports simply to bind themselves, or to covenant, without more, the obligation or covenant is taken to be joint only, and not several; if the contract purports that they bind themselves or coven-

ant severally, the liability is separate; if they purport to bind themselves jointly and severally, or to bind themselves and each of them, or to covenant for themselves and each of them, using both joint and several words, the liability is both joint and several. As agreement between promisors that their liability shall be several does not affect the rights of the promisee, where the promisee intends that their liability shall be joint and is justified in such intention.''

6 Ruling Case Law, 878: ''In other words, *an obligation undertaken by two is presumably joint,* in the absence of express words to render it joint and several, or a statute declaring every contract, though joint in its terms, to be several as well as joint.''

1 Parsons on Contracts, page 11: ''Whether the liability incurred is joint, or several, or such that it is either joint or several, at the election of the other contracting party, depends (the rule above stated being kept in view) upon the terms of the contract, if they are express; and where they are not express, upon the intention of the parties as gathered from all the circumstances of the case.''

1 Williston on Contracts, page 607: ''Following the analogy of the rule of real property that an estate granted to two persons created a joint tenancy rather than a tenancy in common, it was early held and, except as changed by statute, the law remains that promises by two or more persons create a joint duty unless the contrary is stated. *'It is a general presumption of law when two or more persons undertake an obligation that they undertake jointly;* words of severance are necessary to overcome this primary presumption.' The fact that the interests of the obligors in the contract are diverse, does not prevent the duty from being joint.''

2 Elliott on Contracts, pages 744-5: ''When two or more persons assume a contractual obligation or are given a right, it is presumed to be a joint obligation or a joint right in the absence of anything to show a different intention or a statutory enactment changing the rule. The presumption that the obligation is a joint undertaking is not conclusive, however, and may be rebutted, and is rebutted when the obligation contains words of severance which show that it was the intention of the parties that it should be several as well as joint. But *a promise, the subject-matter of which is entire, and which is joint in its terms and object, cannot be made several by any doubtful implication or limitations. Such words as* 'we promise,' 'we hereby guarantee,' 'we will undertake,' *'the plaintiffs are to pay,' 'the directors promise,' no other element entering in, import that the contract is* not to be performed by one of the obligors but by all of them and is therefore *joint.*''

The contract here in question expressly states that ''the Railroad Companies hereby purchase from the Mining Company and agree to receive and pay for, and the Mining Company hereby sells and

agrees to ship from its Illinois mines located at Sparta, the quantity and grade of coal hereinafter, stated, upon the terms and subject to the conditions stated below,'' etc. It further provides that "the Railroad Companies agree to remit in full on or before the twenty-fifth day of each month for all coal shipped during the preceding month.'' The contract thus contains characteristic and appropriate expressions of a joint obligation, and there is no severance of the subject-matter. Indeed, the entire contract will be searched in vain for any word of severance whatsoever. Therefore, according to the great weight of authority above indicated, it was a joint contract by the common law.

In its effort to escape this conclusion appellant asserts that "in determining whether a contract is joint or several, courts look not to its terms alone, but consider who and what the parties to the contract are, the purposes for which and the circumstances under which it was made and to the construction given it by the parties themselves in its actual performance.'' It will be remembered, however, that according to the general rule already stated, in determining the question whether a contract is joint or several, the intention of the parties *as manifested by the language used in the contract* must be followed by the courts. The rule is also thus stated in 13 Corpus Juris, page 578:

"As the promisors or covenantors may bind themselves severally, jointly, or jointly and severally, or in any manner or in any words, the only question is to determine the intention. *If by any means the courts can construe that from the words of the instrument it will be done;* if that cannot be done, then all the circumstances of the case and the interests of the parties will be looked at to discover their intention.''

This contract in usual, plain and appropriate terms manifests an intention that the railroad companies shall be jointly bound. In such case the joint promise cannot be made several "by any doubtful implication or limitations.'' *Express words of severance must appear*. Unless an examination of the cases cited by appellant on this point discloses some application of an exception to the rule we shall be compelled to apply the general rule.

Davis & Rankin v. Hendrix, 59 Mo. App. 444, involved an undertaking on the part of plaintiffs to build a butter and cheese factory for a group of subscribers who signed the contract, each signor setting opposite his name the number of shares he agreed to take. In Combs v. Steele, 80 Ill. 101, certain property owners contracted for an improvement, but each limited his liability by setting the front footage for which he contracted opposite his name. Gaines v. Vandecar, 59 Ore. 187, involved a contract containing a disclaimer of each party on the obligations of his copartners. Chicago Building Co. v. Gra-

ham, 78 Fed. 83, involved a contract like that of Davis & Rankin v. Hendrix, supra. Anderson v. Nichols, 107 Atl. 116, involved an electric light-and-power contract which provided that the prospective customers should "pay to said defendant the sum of $125 each when said transmission line should be constructed to a point opposite their buildings, and $125 each when their buildings should be by said defendant properly· wired and equipped for turning· on said electric current." These cases are inapplicable because all ·the contracts involved contained words of severance, while the contract· here in question contains none. Appellant also cites Satler Lumber Co. v. Exler, 239 Pa. 135; Virginia Black Mountain Coal Co. v. Virginia-Lee Co., 113 Va. 395, and Stanley v. C. C. & C. Railroad Co., 18 Ohio St. 552. They, too, are inapplicable, because they all involve contracts where there was a severance of subject-matter. In this contract there was no severance of the subject-matter, which was 50,000 tons of coal.

It is also urged in behalf of appellant that "the contract shows on its face that the parties did not intend ·that the coal should. be delivered to or received by the two Railroad Companies jointly, but intentionally left it to the railroads, each needing coal for the operation of its own line, to direct that separate shipments be made to each at the several coal-chute points on its line, in accordance. with its needs from time ·to time." · Using this interpretation as a· basis counsel for appellant adroitly build up the argument that the words "receive" and "pay,". as used in the contract clause "the Railroad Companies hereby purchase from. the Mining Company and agree to receive and pay," etc., are the joint predicate of the .sentence .of which "the Railroad Companies" is the subject, that each bears exactly the same relation to the subject, and "as it was intended that each company would separately 'receive,' so it was intended that each would separately 'pay.'" This. conclusion apparently results from a misconception of the use of the word "receive" in the contract. It ·is there used as an obligation assumed by the railroad companies to the mining company, and not as a right or privilege to be. exercised as the railroad ·companies might agree between themselves. The ordinary and accepted· meaning of "receive". is synonymous with that of "accept." [4 Words and Phrases (2 Series) p. 200; Standard. Oil Co. of Indiana v. United States, 164 Fed. 376.] "Accept," in reference to the sale of the goods, means receiving the possession of the goods with the intention of retaining them in performance of the contract. [1 Words and Phrases, p. 52; Ford v. Friedman, 40 W. Va. 177.] It is obvious that· the nature of a joint obligation would not be affected by the manner of its discharge, whether by one. or both of the obligors. ·The obligation· of. the ·mining com-

pany under this contract was to ship or deliver the coal and that of the railroad companies was to receive or accept and pay for same, and the entire obligation of the railroad companies was in express terms a joint one. How they might choose, as between themselves, to discharge it was a matter of no concern to the mining company. Had either or both failed or refused to receive or accept the coal or pay for same obviously neither would have been relieved of the obligation. We regard appellant's contention on this head as without merit.

Appellant further says that ':in the performance of the contract the parties had the same right to place their own construction on it as they had to choose the language of it when they made it, and its practical construction by the parties during its performance, before any controversy as to its meaning had arisen, is conclusive, such practical construction not being violative of its terms.'' [Otis v. Pittsburgh Coal Co., 199 Fed. 86; Fiske v. Fiske, 20 Pick. 499; and Dwelley v. Dwelley, 143 Mass. 509, are cited.] In these cases contracts admittedly ambiguous were involved. In the instant case the contract is in the usual express terms of a joint obligation, without the slightest ambiguity, and containing no words of severance. In such cases courts are not permitted to look into the situation of the parties, their needs served by the contract, the circumstances under which it was made and the construction given it by the parties themselves, in order to change or modify the meaning apparent on the face of the written instrument.

But, appellant urges that plaintiff, having united with defendant in const,ruing the contract as several throughout, is now estopped from asserting a joint liability, and cites Freet v. American Electrical Supply Co., 257 Ill. 248; and Hein v. Westinghouse Air Brake Co., 172 Fed. 524. We have examined the evidence urged in this behalf and are not inclined to agree with appellant's contention, but under the pleadings we deem it unnecessary and improper to review the evidence and expressly rule thereon. The *lex fori* governs in questions of remedy and procedure. Defendant did not plead the above matters as estoppel and it will not now be permitted to interpose that defense. [Creek v. Railroad Co., 293 Mo. l. c. 544; Telephone Co. v. St. Louis, 268 Mo. l. c. 499; Turner v. Edmonston, 210 Mo. l. c. 428.] The contract being joint by the common law, it follows that by the operation of Section 2155, Revised Statutes 1919, supra, it was both joint and several. Similar statutes are in force in Illinois and Alabama (Illinois R. S. 1921, sec. 3, chap. 76; Alabama Code 1923, secs. 6520 and 9543), and an application of the laws of either of these states to this phase of the case would lead us to the conclusion above announced. The trial court properly refused defendant's declaration of law numbered 2.

Another outstanding defense pleaded and here urged by appellant is that defendant was without power, either under its charter or the statutes of Alabama or the law of Illinois, to enter into a joint and several contract for the purchase of coal, and that this contract is, therefore, *ultra vires*. On this phase of the case we must first determine by what law the defense of *ultra vires*, thus interposed, is governed.

Scudder v. National Bank, 91 U. S. 406, l. c. 412-3, a leading case on the subject of conflict of laws and the one perhaps more generally cited by the courts of this country than any other, lays down the following rules:

"Matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, admissibility of evidence, statutes of limitation, depend upon the law of the place where the suit is brought."

The Supreme Court of the United States has not uniformly followed the rules by it laid down in the above case, but the rules have long been approved and generally followed by the courts of Missouri. In Ruhe v. Buck, 124 Mo. 178, l. c. 183, the above excerpt was quoted with approval and the law of the place where the suit was brought was applied as there stated. In Thompson v. Traders' Ins. Co., 169 Mo. 12, l. c. 39, the same statement of rules was again quoted with approval and the law prevailing at the place of performance was applied according to the rule above stated. In Carey v. Schmeltz, 221 Mo. 134, l. c. 138, it was said that "the settled rules of public and international law" require us to interpret the contract according to the *lex loci contractus*. Also, in Hauck Clo. Co. v. Sharpe, 83 Mo. App. 385, l. c. 391, it was said: "It is the general rule that in conflict of laws, that matters connected with the performance of a contract are regulated by the law of the place of performance. [Brown v. Birchall, 150 Pa. St. 164.] But the *lex loci contractus* generally governs as to the validity and the construction of the contract and the capacity of the parties to make it, unless made with special reference to the laws of the place of performance, or concerning real estate." To the same effect are Otis Co. v. Ry. Co., 112 Mo. 622, l. c. 628; Reed v. Western Union Tel. Co., 135 Mo. 661, l. c. 674; Hartmann v. Ry. Co., 39 Mo. App. 88, l. c. 93; Burridge v. N. Y. Life Ins. Co., 211 Mo. 158, l. c. 162; and Tremain v. Dyott, 161 Mo. App. 217, l. c. 221. Without expressing any opinion as to whether or not the intention of the parties is finally determinative of the law applicable to the interpretation of a contract, we call attention to the fact that there is nothing in this contract indicating that it was made with

reference to the laws of the place of performance. The course of ruling indicated by these Missouri cases is supported by eminent authority. For instance, in 13 Corpus Juris, 248, it is said:

"The act of the parties in entering into a contract at a particular place, in the absence of anything shown to the contrary, sufficiently indicates their intention to contract with reference to the laws of that place; hence the rule, as it is usually stated, that a contract as to its validity and interpretation is governed by the law of the place where it is made—the *lex loci contractus*, or, more accurately, that contracts are to be governed as to their nature, validity, and interpretation by the law of the place where they were made, unless the contracting parties clearly appear to have had some other place in view."

On the very question of capacity to make a contract it is said in Wharton on the Conflict of Laws (3 Ed.) pages 906, 907:

"When the party whose capacity is in question is an artificial person, like a corporation, its capacity is necessarily determined, or at least limited, by the law of its creation, though its capacity may be still further restricted, or at least encumbered with conditions, by a statute of another state or country in which it attempts to contract.

. . .

"As between the law of the place where the contract is made and that of the place where it is performable, the weight of authority favors the former. In other words, this matter comes within the first rule of the Scudder case, which, for this purpose, may be treated as an absolute rule, not dependent upon the intention of the parties."

Also, Minor on Conflict of Laws, page 145:

"If a party has not the legal capacity, he cannot enter into a valid contract; if he has the capacity, he may. This question must be determined at the time he *enters into* the contract, not when he comes to *perform* it. It pertains therefore to the *making* of the contract, and hence the element of capacity must be given the same situs that belongs to the making of the contract."

Also, Am. L. Inst. Restatement, Conflict of Laws (Tent.), section 353:

"The law of the place of contracting determines the binding effect of a promise with respect to (a) The capacity to make the promise; (b) The necessary form, if any, in which the promise must be made; (c) The legal requirements for making a promise binding, such as consideration, seal, etc.; (d) The circumstances which make a promise ineffective or a contract voidable; (e) The nature of the act to which a party becomes bound; (f) The time when and the place where the promise is by its terms to be performed; (g) The absolute or conditional character of the promise."

The general trend of the above authorities is that contracts are in every case governed as to their *nature and validity* by the law of the

place where they are made, although for the purpose of deciding the question now before us it is not necessary to go as far as some of these authorities indicate. The rule within which appellant must bring its contention is that matters connected with the performance of a contract are regulated by the law prevailing at the place of performance. In this case defendant seeks to avoid the joint and several nature of its contract on the ground that it was without capacity to make such a contract. By the almost unbroken current of authority in the United States the question of capacity to contract would, in this case, be determined by the law of the place of contracting, affected only by the terms of defendant's charter and possibly by the statutes of the charter granting state, Alabama. [Wharton on the Conflict of Laws (3 Ed.) pp. 906, 907, supra; Pinney v. Nelson, 183 U. S. 1. c. 151; Campbell v. Crampton, 2 Fed. 417; Flittner v. Equitable Life Assur. Soc., 30 Cal. App. 209; McDaniel v. Wetzel, 264 Ill. 212; Milliken v. Pratt, 125 Mass. 374; Case v. Dodge, 18 R. I. 661.] If this defense exists now it also existed at the very time the contract was made and is in no way connected with performance of the contract. Hence, it would be governed by the law of Missouri and not by the law of Illinois. An examination of the cases cited by appellant in support of its claim that this defense, which goes to the essential validity of the contract, is governed by the law of the place of performance discloses that they either fail to sustain appellant's contention or are opposed to the weight of authority in this State as hereinabove indicated.

Plaintiff's reply to defendant's plea of *ultra vires* was that defendant could not set up such defense and was estopped to deny that it was liable on said contract because of certain of its acts and conduct alleged as follows:

"That prior to and on July 1, 1920, one E. E. Norris was the duly elected vice-president in charge of operations of the defendant, and also the duly elected vice-president in charge of operations of the Southern Railway Company in Mississippi, and the said E. E. Norris had authority to purchase supplies and make contracts, and to direct the purchase of supplies and the making of contracts for each of said companies, and also had authority from each of said companies to appoint a purchasing agent for such company. Pursuant to said power he appointed W. J. Diehl purchasing agent for each of said companies, and the said W. J. Diehl as such purchasing agent signed the contract sued upon on behalf of defendant and the Southern Railway Company in Mississippi, and the said E. E. Norris knew of the making of the contract sued on and had actual knowledge of its form and terms, and with full knowledge thereof defendant permitted plaintiff to completely execute said contract. That plaintiff billed and invoiced all the coal delivered under said contract and herein sued for

as sold to the defendant, and addressed all communications for payment for the said coal to defendant, and defendant knew, or ought to have known, that plaintiff was relying upon it for payment for the coal delivered under the contract, but defendant stood by and permitted plaintiff to continue delivering coal under the contract in reliance upon such belief, and defendant has completely executed the contract. That defendant and the Southern Railway Company in Mississippi, both prior to and after the making of the contract in suit, maintained joint offices in the city of St. Louis, Missouri, and used stationery with the names of both said companies inscribed thereon, and had common offices, and both said companies were owned and controlled by the Southern Railway Company, a Virginia corporation.''

In 7 Ruling Case Law, pages 674, 675, 676, with reference to the defense of *ultra vires,* it is said:

''In suits between the corporation and strangers dealing with it, the question is whether the act is one which the corporation is not authorized to perform under any circumstances, or one that it may perform for some purposes, or under certain conditions. In the first case it is strictly *ultra vires;* and as a general rule there can be no recovery because the party dealing with the corporation is bound to know, from the law of its existence, that it has no power to perform it. In the second case the contract is not in its strict sense *ultra vires,* and the issue will turn upon whether the party dealing with it is aware of the intention to perform the act for some unauthorized purpose, or whether the attendant circumstances justify its making and its performance. . . . However, the defense is looked upon by many courts with disfavor whenever it is presented for the purpose of avoiding an obligation which a corporation has assumed merely in excess of the powers conferred upon it, and not in violation of some express prohibition of the statute; and, in the modern cases especially, the rule has been frequently announced that the plea of *ultra vires* should not be allowed to prevail, whether interposed for or against a corporation, when it will not advance justice, but, on the contrary, will accomplish a legal wrong.''

Among the numerous cases cited in a note supporting the last sentence above quoted is First National Bank v. Guardian Trust Co.. 187 Mo. l. c. 526, 534. Regarding the availability of the defense of *ultra vires* we there said:

''The conclusions reached as indicated herein find support in a number of well-considered cases in other jurisdictions, and is in keeping with that just rule, as announced by the New York courts, that the plea of *ultra vires* should not as a general rule prevail, whether interposed for or against a corporation, when it would not advance justice, but on the contrary would accomplish a legal wrong.

Similar views are entertained by the Supreme Court of the United States. In Railroad v. McCarthy, 96 U. S. 1. c. 267, it is said that 'the doctrine of *ultra vires*, when invoked for or against a corporation, should not be allowed to prevail where it would defeat the ends of justice or work a legal wrong.' . . .

"At this advanced age in our civilization and the rapidity with which our commercial interests are advancing, methods and occasions for concentrating the efforts of our people in the prosecution of business by forming corporations, multiplying from day to day, the time is at hand for the enforcement of the rule as announced by Lord St. Leonards in Railroad v. Hawks, 5 H. L. Cases, 1. c. 370, where it was said that 'the safety of men in their daily contracts require that this doctrine of *ultra vires* should be confined within narrow bounds.' "

In Cass County v. Mercantile Town Ins. Co., 188 Mo. 1, 1. c. 14, we said:

"It is well settled in this State that the defense of *ultra vires* is not open to a corporation when the contract has been fully executed on the part of the other contracting party, and it is not expressly prohibited by law."

In Joseph Schlitz Brewing Company v. Missouri Poultry & Game Co., 287 Mo. 400, 1. c. 407, we cited and fully reviewed the cases on the question of *ultra vires* and stated the rule as follows:

"This court and the courts of appeals of this State long since adopted the rule in force in most of the states which we said in Millinery Co. v. Trust Co., 251 Mo. 1. c. 579, has been tersely stated by Rombauer, P. J., in Winscott v. Inv. Co., 63 Mo. App. 1. c. 369, to be that: 'the defense of *ultra vires* is not admissible where the contract has been fully executed on one side, unless it is a contract expressly prohibited by law.' "

In Marshall v. Maccabees, 270 S. W. 418, 1. c. 419, the St. Louis Court of Appeals reaffirmed the rule as follows:

"It is well settled in this State that the defense of *ultra vires* is not open to a corporation when the contract in suit has been fully executed on the part of the other contracting party, and it is not expressly prohibited by law."

In Lohrer v. Charles F. Vogel Real Est. Co. (St. Louis Court of Appeals), 239 S. W. 1098, 1. c. 1100, defendant, a real estate corporation, sold plaintiff a note secured by a deed of trust. When the note fell due, plaintiff demanded her money, and defendant replied that if she would renew the note defendant would guarantee its payment. The note was extended, and when it fell due plaintiff foreclosed the deed of trust and sued defendant on its guaranty for the difference between the amount of the note and the amount realized at the foreclosure sale. The defense was that the guaranty was *ultra vires*, and as to this the court said:

"The contract between plaintiff and defendant has been executed. Plaintiff forbore the sale under the original deed of trust, and performed her part of this contract, and defendant would now be estopped from claiming *ultra vires,* because the acts of defendant, in executing this guaranty, are not prohibited by its by-laws, articles of incorporation, or the general laws. A corporation, deriving all its powers to act from its articles of incorporation and the general law, can make no lawful contract in violation of the provisions of either; but such a corporation cannot take advantage of the authorized act of one of its officers in leading some one into the performance of an agreement which is not prohibited by its articles or the general laws. This is especially true where the contract has been executed by the other party. [Smith v. Richardson, supra; Mining Co. v. Taylor, 247 Mo. 1, 152 S. W. 5; St. Louis Drug Co. v. Robinson, 81 Mo. 18; City of Goodland v. Bank, 74 Mo. App. 365.]"

Such is the law in Missouri as to the availability of the defense of *ultra vires* under the circumstances noted. Appellant contends that under its charter and the statutes of Alabama it was without power to bind itself by the joint and several contract here pleaded, but the record before us does not disclose any charter or statutory provision prohibiting its doing so. According to the record plaintiff had fully performed the contract, and the other railroad to which the coal yet unpaid for was delivered at the instance and request of the dual agent of said railroads was in the hands of a receiver long before the defense of *ultra vires* was interposed. Appellant contends, however, that the interposition of this defense will not result in a legal wrong. We do not agree that such would be the case. It appears that the other railroad company is insolvent and unless defendant pays plaintiff it will never be paid for the coal in question. It is said that defendant received no benefit under the contract. Again we do not agree with appellant. Under the agreed statement of facts at the time defendant signed this contract E. E. Norris was the duly elected vice-president in charge of the operations of both railroads, he had authority to purchase supplies and make contracts and to direct the purchase of supplies and the making of contracts for each of said companies and to appoint a purchasing agent for said companies; pursuant to said power he appointed W. J. Diehl purchasing agent of said companies and the said W. J. Diehl as such purchasing agent signed this contract, the said Norris at the time having full knowledge of said contract and the contents thereof; both prior to and after the making of said contract said railroads maintained joint offices in the city of St. Louis, Missouri, used stationery with the names of both companies inscribed thereon, had common officers, and were both owned and controlled by the Southern Railway Company, a Virginia corporation; and all the coal delivered un-

der said contract was shipped as directed by the dual agency of said companies, and the same was invoiced to and all communications for the payment thereof were addressed to defendant. True, it is conceded that none of the coal the purchase price of which is here sued for was used by defendant, but for that reason defendant would not be relieved of liability under its joint and several contract. Nor can we say that defendant derived no benefit from the contract. The above arrangements under which the two railroads chose to conduct their business, including the making of this contract for the purchase of coal, were evidently by them deemed mutually beneficial or they would not have been pursued. The coal purchased under this contract was no inconsiderable amount, doubtless resulting in terms more advantageous to them than could have been obtained in the purchase of a smaller amount. Defendant used and paid for more than half of the total amount called for by the contract and received its proportionate share of the benefits incident thereto. During all the time it was receiving these substantial benefits, at least some of which must have been pecuniary, it made no suggestion that in signing the contract it had exceeded its corporate powers. Not until about seven days before the contract was to expire did defendant even intimate that it would not pay this indebtedness, although for weeks previous plaintiff had addressed repeated demands therefor to defendant, and even then it did not suggest that the defense of *ultra vires* would be interposed. It is true that in a letter addressed to plaintiff under date of January 14, 1921, Mr. J. L. Howell, as superintendent of transportation for both railroads, requested plaintiff to "bill eight cars of this coal per week to the Columbus & Greenville Railroad at Columbus, Miss, and the balance to the Columbus & Greenville Railroad at Winona, Miss., instead of the Mobile & Ohio, as you have been doing in the past." Counsel for appellant now strenuously urge that the word "bill" as here used means "to charge against another in an account for future payments," and even contend that the word has no other meaning or usage. Even if defendant had used the word in that sense we fail to see how its original contract would thereby be altered. But counsel are plainly in error as to both contentions. The transitive verb "bill" has a common and well-known usage in railroad and shipping circles synonymous with "ship." In The Century Dictionary and Cyclopedia this usage is illustrated by the following excerpt from United States Constitution Report, No. 73, page CXII:

"Parties in the United States having goods to ship to Corea may, as heretofore, have them billed to Yokohama by American or other lines and then rebilled to Corea."

The context of defendant's above letter plainly shows that such was its intended usage and meaning. The expression merely

amounted to shipping instructions and was so understood by both parties, because in its reply plaintiff indicated its willingness to be governed thereby and thereafter treated it as such throughout and continued to render invoices and make demands on defendant for the purchase price thereof without any objection or intimation on the part of defendant that it would not pay same until about seven days before the expiration of the contract, when for the first time it denied liability. Surely under the law of Missouri defendant cannot now avail itself of the defense of *ultra vires*.

Appellant also says that the question of estoppel is to be governed by the law of Illinois where plaintiff performed its part of the contract, and that under the law of that state the defense of *ultra vires* is available in this case. We do not consent to the first proposition, and it, therefore, becomes unnecessary for us to rule on the second. The acts and conduct of defendant which make this defense unavailable do not arise out of, nor are they in any sense connected with, the performance of the contract. They were misleading from the very start and having been persisted in until the contract was duly performed defendant cannot now by pleading *ultra vires* avail itself of an inconsistent position to effect a legal wrong. The law of the place of contracting would still govern, and we deem it unnecessary to burden this opinion with a consideration of the law of Illinois.

Appellant further says that the dual agent, Mr. Diehl, did not have authority ''to bind defendant to the asserted obligation.'' No authorities are presented in support of this suggestion. We think the stipulated facts and the conclusions of law, hereinabove approved dispose of this question adversely to appellant's contention.

The conclusions we have reached and stated herein obviate the necessity of considering other contentions made by appellant.

Finding no error in the rulings of the trial court it follows that its judgment herein should be and the same is affirmed. All concur.